**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-2012
_____


UNITED STATES OF AMERICA

v.

ROBERT STINSON, JR.,
                              Appellant


_____


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(No. 2-10-cr-00724-001)
District Judge:  Hon. Michael M. Baylson

Argued:  March 20, 2013
_____


Before:  FUENTES, CHAGARES, and BARRY, <u>Circuit
Judges</u>.


(Opinion Filed:  August 21, 2013)

---

## OPINION

---

Leigh M. Skipper, Esq.
Brett G. Sweitzer, Esq.
Keith M. Donoghue, Esq. [ARGUED]
Federal Community Defender Office for the Eastern District
of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106

   Counsel for Appellant

Zane David Memeger, Esq.
Robert A. Zauzmer, Esq.
David L. Axelrod, Esq. [ARGUED]
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

   Counsel for Appellee

CHAGARES, Circuit Judge.

   Robert Stinson pled guilty to a twenty-six count indictment that arose out of a fraud scheme that he operated from 2006 to 2010. Stinson appeals his sentence and argues that the District Court improperly applied a fraud enhancement, committed procedural error during sentencing,

2

and imposed a sentence that was substantively unreasonable. His appeal requires us to define the scope of U.S.S.G. § 2B1.1(b)(15)(A), which increases a defendant's offense level by two points when "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." We conclude that the enhancement applies only when financial institutions are the source of a defendant's gross receipts. We will therefore vacate Stinson's judgment of sentence and remand for resentencing in accordance with this opinion.

## I.

Stinson's conviction arose from a fraud scheme that began in 2006 when he sought investors for a fund called Life's Good S.T.A.B.L. Mortgage Fund, LLC ("Life's Good"). Around the same time, Stinson also founded the Keystone State Corporation, which he used to market the fund to potential investors. The alleged purpose of Life's Good was to originate mortgage loans and Stinson advertised the fund as a way for investors to recoup a sixteen percent annual return. Stinson targeted investors with individual retirement accounts ("IRAs") and those who maintained accounts with self-directed IRA custodians. When he began his scheme, Stinson primarily solicited money for the fund by hiring telemarketers to "cold call" potential investors. Those telemarketers advertised the fund as a risk-free investment.

In reality, Life's Good was a sham. Stinson did not use investors' money to make mortgage loans. Instead, he diverted the money to a variety of personal business ventures that employed his family and friends without requiring them to work. These businesses, none of which turned a profit,

3

included a healthcare consulting firm, an athlete representation company, an online television station, and an artist representation agency.

In 2009 and 2010, Stinson expanded his efforts. He created a fictitious prospectus that purported to explain the fund's activity from 2007 to 2008. The prospectus misrepresented the amount originated in mortgage loans, the fund's annual returns, and results from an independent audit that never occurred. Stinson also misrepresented his education and employment history and concealed his prior convictions for fraud. In addition, he used false information to convince Morningstar, an independent investment rating agency, to give Life's Good funds a favorable rating. Many of the fund's investors relied on this rating when deciding to invest their IRAs with Life's Good.

Stinson began to communicate with two independent financial advisory firms, Brentwood Financial ("Brentwood") and Total Wealth Management ("TWM"), in 2009. At least one of those firms, Brentwood, was a registered investment advisor, which means that the organization had registered with the Securities and Exchange Commission ("SEC"). Stinson's relationship with these institutions formed the basis for the application of the disputed fraud enhancement. Both firms entered into agreements with Stinson to refer investors to Life's Good in exchange for referral fees. During 2009 and 2010, Brentwood and TWM used the fund's fictitious marketing materials to solicit numerous investors, who collectively invested millions of dollars in the fund. It appears as though the clients of Brentwood and TWM made individual decisions to invest with Life's Good on the advice of their investment advisors at each firm. However, some of

4

the victim impact statements suggest that Brentwood and TWM retained control over the assets of certain clients and invested in Life's Good on their behalf.

In June 2010, the SEC initiated a civil enforcement action against Stinson. Stinson eventually admitted to the details of his scheme and in November 2010 a grand jury returned a twenty-six count indictment that charged him with wire fraud in violation of 18 U.S.C. § 1343, mail fraud in violation of 18 U.S.C. § 1341, money laundering in violation of 18 U.S.C. § 1957, bank fraud in violation of 18 U.S.C. § 1344, filing false tax returns in violation of 26 U.S.C. § 7206(1), obstruction of justice in violation of 18 U.S.C. § 1505, and making false statements in violation of 18 U.S.C. § 1001. The SEC's analysis of Stinson's accounts ultimately showed that Life's Good solicited over $17.6 million from at least 262 investors and returned approximately $1.9 million. Because Stinson targeted those with IRAs, many individuals lost part or all of their retirement savings as a result of their investments in Life's Good.

On August 15, 2011, Stinson entered an open guilty plea. He was sentenced on April 10, 2012. At sentencing, Stinson challenged two conclusions contained in the presentence investigation report ("PSR"): that there were more than 250 victims of his crime and that he derived more than $1 million from financial institutions on the basis that his gross receipts totaled less than $1 million. After hearing testimony from an SEC accountant, the District Court rejected both of Stinson's challenges and adopted the PSR, which calculated an advisory United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") initial offense level of seven and applied five fraud-related sentencing enhancements. The

5

largest of those enhancements applied a twenty-level increase for a total loss amount between $7 million and $20 million. The court also imposed the enhancement that is at issue in this appeal, an increase of two offense levels because "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." U.S.S.G. § 2B1.1(b)(15)(A). The five fraud enhancements, combined with a separate enhancement for obstruction of justice and a downward adjustment for acceptance of responsibility, resulted in an offense level of thirty-eight. That offense level, combined with Stinson's criminal history category of III, yielded an advisory Guidelines range of 292 to 365 months of imprisonment. The Government sought an above-Guidelines sentence of 480 months. Stinson asked for leniency.

After calculating the advisory Guidelines range, the District Court granted the Government's motion for an upward departure, finding that

> the defendant's conduct is just abhorrent . . . the injury and the distress that he has caused to over 250 people is not anything that is accounted for in the Guidelines, that the fraud was massive, that his criminal history is not reflected in the Guideline calculation . . . that this is his fifth conviction for fraud. And he has shown himself to be a recidivist of the most serious type. . . . [T]he consequences of his criminal

6

conduct in this case are immense. And I've said this in other cases; the consequences of criminal conduct, in my view, are not adequately accounted for under the Guidelines.

App. 365-66. The court then turned to step three of the sentencing process and "reach[ed] the same conclusion" after a consideration of the relevant factors set forth in 18 U.S.C. § 3553(a). App. 367. The District Court pointed to the need for deterrence as a "key factor" and observed that, if Stinson were younger, he would probably face a higher sentence. Id. The District Court ultimately sentenced Stinson to a total term of 400 months, arriving at that figure by using the high end of the advisory Guidelines range, 365 months, and adding approximately ten percent, or thirty-five months. The court also ordered restitution in the amount of $14,051,246.

Stinson filed this timely appeal, contending that application of U.S.S.G. § 2B1.1(b)(15)(A) was plain error and that his sentence was procedurally erroneous and substantively unreasonable.

## II.[1]

We consider first Stinson's contention that the plain language of U.S.S.G. § 2B1.1(b)(15)(A) cannot apply to his

---

[1] The District Court had jurisdiction over the prosecution of this criminal action pursuant to 18 U.S.C. § 3231. We have jurisdiction over Stinson's appeal pursuant to 28 U.S.C. § 1291.

conduct because the money flowed from individual investors, not financial institutions like Brentwood and TWM. The clear language of the provision and its use of the word "derived," Stinson contends, directs the sentencing court to the source of the receipts. The Government responds that application of the provision was not plain error.

At sentencing, a district court must find facts that relate to application of the Guidelines by a preponderance of the evidence. United States v. West, 643 F.3d 102, 104-05 (3d Cir. 2011). We will ordinarily "exercise plenary review over legal questions about the meaning of the [S]entencing [G]uidelines" and apply a "clearly erroneous standard to factual determinations underlying their application." United States v. Reynos, 680 F.3d 283, 286 (3d Cir. 2012) (alterations in original) (quotation marks omitted). In this case, however, Stinson concedes that he did not preserve the issue below.[2] As a result, we will review for plain error and grant relief only if we conclude that (1) there was an error, (2) the error was "clear or obvious," and (3) the error "affected the appellant's substantial rights." Puckett v. United States, 556 U.S. 129, 135 (2009); see also United States v. Fumo, 655 F.3d 288, 325 (3d Cir. 2011). If those three prongs are satisfied, we have "the discretion to remedy the error — discretion which ought to be exercised only if the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." Puckett, 556 U.S. at 135 (alteration in original) (quotation marks omitted). Stinson's appeal raises an issue of first impression, but lack of precedent alone

---

[2] Stinson objected to application of the enhancement at sentencing on the basis that the evidence did not show that he had received more than $1,000,000.

8

will not prevent us from finding plain error. United States v. Evans, 155 F.3d 245, 252 (3d Cir. 1998) ("Neither the absence of circuit precedent nor the lack of consideration of the issue by another court prevents the clearly erroneous application of statutory law from being plain error."); see also United States v. Tann, 577 F.3d 533, 536-38 (3d Cir. 2009) (finding plain error even though appeal raised a novel issue).

A.

To address Stinson's claim of error, we look first to the text of the disputed enhancement, which provides: "[i]f . . . the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense, increase by 2 levels." U.S.S.G. § 2B1.1(b)(15)(A). "[W]e read Guidelines provisions for their plain meaning." United States v. Greene, 212 F.3d 758, 761 (3d Cir. 2000); see also United States v. Brown, 578 F.3d 221, 227 (3d Cir. 2009) ("When construing the Guidelines, we look first to the plain language, and where that is unambiguous we need look no further." (quotation marks omitted)). To understand a provision's plain language, we may look to the dictionary for guidance. United States v. Maurer, 639 F.3d 72, 78 (3d Cir. 2011). For instance, "derived" means "[r]eceived from [a] specified source." Black's Law Dictionary 444 (6th ed. 1990). Webster's Dictionary provides a nearly identical definition, defining "derive" as "to take or receive esp[ecially] from a specified source." Webster's Ninth New Collegiate Dictionary 342 (1986).

The Sentencing Commission amended the provision in 2001. Before that, the Guidelines added four offense levels "[i]f the offense . . . affected a financial institution and the

9

defendant derived more than $1,000,000 in gross receipts from the offense." U.S.S.G. § 2B1.1(b)(6)(B) (2000) (emphasis added). The two requirements — the amount in gross receipts and the effect on a financial institution — were "separate and distinct prerequisites."[3] Greene, 212 F.3d at 761. The "affected" requirement of the pre-2001 version encompassed "even minimal impacts" on financial institutions. United States v. Wiant, 314 F.3d 826, 830 (6th Cir. 2003). The requirement that a defendant personally derive more than $1 million from the offense operated to limit application of the enhancement. Id. ("The seriousness of the 4-point enhancement, of course, reflects the other key limitation of this provision — that the defendant derive more than $1,000,000 in gross receipts from the offense."); see also United States v. Bennett, 161 F.3d 171, 193 (3d Cir. 1998) (applying pre-2001 enhancement when the defendant personally derived more than $1,000,000 and his conduct affected financial institutions by exposing them to civil litigation and harming their reputations).

Since the 2001 amendments, no court has specifically considered the question we address here: whether a financial

---

[3] In Greene, the Court examined the language once contained in § 2F1.1. Before the 2001 amendments, the Guidelines contained the "affected a financial institution" enhancement in two places: § 2B1.1, which then, like now, addressed larceny, embezzlement, and other forms of theft, and § 2F1.1, which governed offenses involving fraud, deceit, forgery, and altered or counterfeit instruments. The 2001 amendments consolidated § 2F1.1 with § 2B1.1, which now addresses those offenses formerly governed by § 2F1.1. See United States v. Khorozian, 333 F.3d 498, 509 n.10 (3d Cir. 2003).

institution must be the source of $1 million in gross receipts for the enhancement to apply. However, several of our sister courts of appeals have addressed a related issue — whether the new language represented a substantive change or simply clarified the existing language — to determine whether the amended language applies retroactively. Each court to address the issue has concluded that the change was a substantive one. In United States v. Hartz, for instance, the Court of Appeals for the Seventh Circuit held that "by focusing on the amount derived from the financial institutions rather than the amount derived from the offense as a whole," the new language "substantively change[d] the requirements for applying the guideline." 296 F.3d 595, 599 (7th Cir. 2002). The Court of Appeals for the Ninth Circuit considered the same question and described the new language as "more lenient" than the pre-2001 provision — that is, more generous to defendants and more difficult for the Government to satisfy. United States v. Van Alstyne, 584 F.3d 803, 819 (9th Cir. 2009). Under the old language, the court observed, "any impact on a financial institution" would justify imposition of the four-level enhancement. Id. The new language, however, makes "equally clear that the enhancement only applies if gross receipts in excess of $1 million are derived from a financial institution." Id. "Under [the new] language, the only effect on a financial institution that counts is money flowing from a financial institution into the defendant's coffers." Id.; see also United States v. Amico, 573 F.3d 150, 151 (2d Cir. 2009) (per curiam) (holding "that the 2001 amendment substantively changes an unambiguous provision and therefore does not apply retroactively"); United States v. Swanson, 360 F.3d 1155, 1166-67 (10th Cir. 2004) (same); United States v. Monus, 356 F.3d 714, 718 (6th Cir. 2004) (same).

11

The 2001 amendments to the language altered the source that would trigger application of the enhancement. Before, a defendant need only have derived $1 million from the offense conduct. The portion that addressed financial institutions remained separate. Now, however, the language of the provision merges the formerly separate requirements of source and profit. We ultimately need look no further than the plain language of the disputed enhancement, which applies a two-level increase if "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." U.S.S.G. § 2B1.1(b)(15)(A). The word "derived" directs us to determine the source of the funds.

We thus hold that U.S.S.G. § 2B1.1(b)(15)(A) will apply when the evidence shows that a financial institution,[4]

---

[4] The Application Notes to U.S.S.G. § 2B1.1(b)(15)(A) explain that:

> "Financial institution" includes any institution described in 18 U.S.C. § 20, § 656, § 657, § 1005, § 1006, § 1007, or § 1014; any state or foreign bank, trust company, credit union, insurance company, investment company, mutual fund, savings (building and loan) association, union or employee pension fund; any health, medical, or hospital insurance association; brokers and dealers registered, or required to be registered, with the Securities and Exchange Commission; futures commodity merchants and commodity pool operators registered, or required to be registered, with the Commodity Futures Trading

12

not an individual, was the source of the $1 million in gross receipts. A financial institution is a source of a defendant's gross receipts if it owns the funds. Hence, a financial institution is a source of the gross receipts when it exercises dominion and control over the funds and has unrestrained discretion to alienate the funds. A financial institution is not the source of all funds that have passed through the institution, as might occur during a simple wire transfer. Accordingly, mere tangential effects on financial institutions will not support application of the enhancement.[5]

---

> Commission; and any similar entity, whether or not insured by the federal government. "Union or employee pension fund" and "any health, medical, or hospital insurance association," primarily include large pension funds that serve many persons (e.g., pension funds of large national and international organizations, unions, and corporations doing substantial interstate business), and associations that undertake to provide pension, disability, or other benefits (e.g., medical or hospitalization insurance) to large numbers of persons.

U.S.S.G. § 2B1.1 app. n.1.

[5] Courts have taken a similar approach to interpreting 18 U.S.C. § 1957(a), a money laundering statute that punishes an offender who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." Though different courts of appeals have different requirements that govern the extent to which proceeds must flow from illegal activities, all have looked to the source of the proceeds. See United States v. Hetherington, 256 F.3d 788, 794 (8th Cir. 2001) (looking to the "source of the funds

13

B.

With this understanding of "derived," we turn to Stinson's argument:   that the District Court improperly applied U.S.S.G. § 2B1.1(b)(15)(A)'s two-level increase to him.  The District Court applied the enhancement on the basis of Brentwood's and TWM's involvement in Stinson's scheme.  The Government claims that application of the enhancement was not plain error because Stinson persuaded the firms to market his fund to their clients, received substantial sums from their efforts, and exposed Brentwood and TWM to liability from its clients.

The pre-2001 provision may well have applied to Stinson's conduct — the Government describes outcomes that potentially "affected" Brentwood and TWM.  However, from the record currently before us, it does not appear that these facts satisfy the definition of "derived" set forth in this opinion because Brentwood and TWM were not the source of Stinson's gross receipts.  But we are unable to conclude definitively that the enhancement does not apply because the

---

for the wire transfer" to determine from where defendant derived the money); United States v. Sokolow, 91 F.3d 396, 409 (3d Cir. 1996) (holding that the source of the proceeds may be "commingled with funds obtained from legitimate sources"); see also United States v. Warshak, 631 F.3d 266, 318 (6th Cir. 2010) (addressing 18 U.S.C. § 1956(a)(1)(A)(i) promotional money laundering claim and looking to the "money from illegal sources" to determine whether the proceeds of unlawful activity were involved (quotation marks omitted)).

record is unclear as to whether Brentwood or TWM invested any money on behalf of their clients. The record as developed on remand may indeed support application of the enhancement.

Application of the fraud enhancement on the current record, however, was error. That error was clear in light of the plain language of the relevant Guidelines provision and the evidence before the District Court. United States v. Dickerson, 381 F.3d 251, 260 (3d Cir. 2004) (concluding that the error was "'plain,' given the clarity of the statutory language"). The enhancement increased Stinson's offense level by two, which in turn increased his advisory Guidelines range. The District Court used that advisory range to calculate the above-Guidelines sentence it ultimately imposed. A sentencing error that results in a longer sentence "undoubtedly affects substantial rights," United States v. Portillo-Mendoza, 273 F.3d 1224, 1228 (9th Cir. 2001) (quotation marks omitted), and "affect[s] the outcome of the district court proceedings," United States v. Andrews, 681 F.3d 509, 517 (3d Cir. 2012) (alteration in original) (quotation marks omitted). See also United States v. Knight, 266 F.3d 203, 207 (3d Cir. 2001) (explaining that application of an incorrect Guidelines range is presumptively prejudicial, even if the sentence imposed also falls within the correct range). Imposition of the fraud enhancement on the existing record was therefore plain error. Because that error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings," Puckett, 556 U.S. at 135 (quotation marks omitted), we will exercise our discretion to correct it.

We will therefore vacate and remand for the District Court to reconsider application of U.S.S.G. § 2B1.1(b)(15)(A) in light of this opinion and to resentence Stinson accordingly.[6]

## III.

In accordance with the foregoing, we will vacate Stinson's judgment of sentence and will remand for resentencing in accordance with this opinion.

---

[6] Stinson also alleges three procedural errors. First, he suggests that the District Court stated during sentencing that it would grant the motion for an upward departure but indicated in its "Statement of Reasons" that it had not done so. As a result, Stinson argues, it is unclear from the record whether the District Court believed it was departing upward at step two or varying upward pursuant to the § 3553(a) factors at step three. Second, Stinson contends that the District Court did not specify how any departure at step two affected Stinson's advisory Guidelines range and improperly blended steps two and three of the proper sentencing procedure. Third, Stinson argues that the District Court only addressed his criminal history, the basis of the Government's departure motion, in the course of its assessment of the § 3553(a) factors, which occurs at step three. Because we must remand to the District Court for resentencing, we need not resolve Stinson's procedural objections.