PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-3033
_____

UNITED STATES OF AMERICA

v.

SCOTT CAPPS,
Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-18-cr-0572-001)
District Judge:  Hon. Michael M. Baylson
_____

Argued
June 16, 2020

Before:   JORDAN, MATEY and ROTH, *Circuit Judges.*

(Filed: October 8, 2020)
_____

Abigail E. Horn   [ARGUED]
Leigh M. Skipper
Federal Community Defender Office
  For the Eastern District of Pennsylvania
601 Walnut Street – Suite 540
Philadelphia, PA   19106
      *Counsel for Appellant*

David J. Ignall   [ARGUED]
Office of United States Attorney
615 Chestnut Street – Suite 1250
Philadelphia, PA   19106
      *Counsel for Appellee*

_____

## OPINION OF THE COURT

_____

JORDAN, *Circuit Judge*.

While working for The Vanguard Group ("Vanguard"), Scott Capps fraudulently caused funds from dormant accounts to be mailed to co-conspirators, one of whom then wrote checks conveying back to him some of the proceeds. Capps was eventually charged with, and pled guilty to, conspiracy to commit mail fraud, money laundering, and tax evasion. At sentencing, he did not raise any objections to the Presentence Report ("PSR") that had been prepared, and the District Court adopted its calculation of the applicable guidelines range.

Capps now contends that the District Court plainly erred in applying two upward adjustments in calculating his guidelines range. First, he says that, in setting the offense level

2

for the money laundering, the District Court wrongly applied an adjustment for abuse of a position of trust ("the abuse of trust adjustment"). Second, he makes two arguments that the District Court erred in applying an adjustment for deriving more than $1 million from a financial institution ("the gross receipts adjustment"). More specifically, he says that the gross receipts adjustment should not have been applied because the account holders, not Vanguard, were the source of the funds, and he further argues that the District Court made contradictory statements about whether he met the threshold for the adjustment to apply.

As to the offense calculation for money laundering, we agree that the District Court plainly erred in applying the abuse of trust adjustment. As to the application of the gross receipts adjustment, we conclude that, while the District Court did not plainly err in deciding the adjustment could be applicable, it is not clear on this record whether Capps met the threshold for the adjustment to actually apply. We will therefore vacate Capps's sentence and remand for resentencing.

## I.    BACKGROUND

Vanguard is "an investment management group that manage[s] trillions of dollars in assets for account holders throughout the world." (Indictment, App. at 16.) Through his employment there, Capps was able to identify accounts that were due for escheatment because of, for example, the death of an account holder with no heirs or the abandonment of funds in an account. Capps drew the money from such accounts by surreptitiously using subordinates' passwords and causing Vanguard to mail checks drawn on the accounts to his friend,

3

Lance Tobin, and others. He concealed his actions by falsifying documents and deleting records.

Tobin deposited the stolen funds into his bank accounts and then wrote checks back to Capps to pay him a portion of the criminal proceeds. As stated in the indictment, Capps received at least two checks from Tobin, one for $555,200 and one for $29,750. Capps deposited those checks in his bank account and did not report the income on his federal tax returns.

When the scheme came to light, Capps was charged with conspiracy to commit mail fraud in violation of 18 U.S.C. § 1349, money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2, and filing a false tax return in violation of 26 U.S.C. § 7206(1). He pled guilty to all charges.

A PSR was prepared, employing the United States Sentencing Guidelines. It calculated Capps's offense level for money laundering, though not for conspiracy to commit mail fraud, and included two separate 2-level adjustments that Capps now disputes: the abuse of trust adjustment and the gross receipts adjustment. At the time of sentencing, however, neither party raised any objections to the PSR, and the District Court adopted its recommendations without change. The resulting guidelines range was 63 to 78 months. The Court varied downward and sentenced Capps to 48 months' imprisonment and 3 years' supervised release. It also ordered Capps to pay $2,137,580.81 in restitution to Vanguard. Capps now appeals.

4

## II.    DISCUSSION[1]

Capps argues that the District Court erred in applying both the abuse of trust adjustment and the gross receipts adjustment. We address each in turn.

Before turning to the merits, however, we first note the standard of review and how it marks our analytical path. Because Capps did not at sentencing raise any objections to the application of the adjustments, we review for plain error. The plain-error standard requires, first, an error, second, that the error be plain – "that is to say, clear or obvious[,]" and third, a "reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016) (citation and internal quotation marks omitted). This third prong of the standard is sometimes described as requiring that the plain error has affected the defendant's substantial rights. *United States v. Olano*, 507 U.S. 725, 732 (1993). "Once these three conditions have been met," there is a fourth prong to the test, which advises that "the court of appeals should exercise its discretion to correct the forfeited error if the error 'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *Molina-Martinez*, 136 S. Ct. at 1343 (quoting *Olano*, 507 U.S. at 736).

The Supreme Court has given directly pertinent guidance on how the third and fourth prongs of the plain-error test apply in cases like this. As to the third prong, the Court

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

5

has explained that "[i]n most cases a defendant who has shown that the district court mistakenly deemed applicable an incorrect, higher Guidelines range has demonstrated a reasonable probability of a different outcome." *Id.* at 1346. And, concerning the fourth prong, the Court has said that, where the guidelines have been miscalculated, a "reasonable citizen" would "bear a rightly diminished view of the judicial process and its integrity." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1908 (2018). Of course, "any exercise of discretion … inherently requires a case-specific and fact-intensive inquiry." *Id.* at 1909 (internal quotation marks omitted). But, "[i]n the ordinary case … the failure to correct a plain Guidelines error that affects a defendant's substantial rights will seriously affect the fairness, integrity, and public reputation of judicial proceedings." *Id.* at 1911.

Nothing in this case suggests that we should stray from those general principles, so we take the third and fourth prongs of the plain-error test as being met here and are only left to determine whether the District Court erred in applying the adjustments and, if so, whether those errors were plain. In short, we are examining prongs one and two.

### A.    The Adjustment for Abuse of Trust

Capps first argues that the District Court erred in applying the abuse of trust adjustment to his money laundering conviction. That adjustment, set forth in Chapter 3 of the Sentencing Guidelines, tells a sentencing court that, "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase [the offense level] by 2 levels." U.S.S.G. § 3B1.3. Importantly,

6

however, Note 2(c) of § 2S1.1, the guideline applicable to money laundering convictions, directs that adjustments contained in Chapter 3 are to be applied based on the money laundering behavior alone, not on the underlying offense from which the laundered funds were derived. In other words, the abuse of a position of trust has to be manifested in how the money is laundered, not in how the money was gained. According to Capps, the District Court plainly erred because, in applying the adjustment, it relied on his position at Vanguard and his conduct related to the conspiracy to commit mail fraud, not on any position he had or anything he did in laundering the stolen funds. We agree.

### 1. Calculating the Offense Levels

To explain the error, we need to walk through the guidelines calculations for both Capps's mail fraud and money laundering convictions,[2] as the guidelines require a sentencing court to group those convictions by choosing the highest offense level calculation after calculating the level for each offense separately. *See* U.S.S.G. § 2S1.1 cmt. n.6 ("In a case in which the defendant is convicted of a count of laundering funds and a count for the underlying offense from which the laundered funds were derived, the counts shall be grouped pursuant to subsection (c) of §3D1.2[.]"); U.S.S.G. § 3D1.3(a)

---

[2] For ease of reference, we speak in terms of Capps's "mail fraud" conviction, recognizing that the conviction was, more precisely, for conspiracy to commit mail fraud. The distinction has no bearing on our analysis. *See* U.S.S.G. § 2X1.1(a) (providing that the offense level for conspiracy is the same as the offense level for the substantive offense).

("In the case of counts grouped together pursuant to §3D1.2(a)-(c), the offense level applicable to a Group is the offense level … for the most serious of the counts comprising the Group, *i.e.*, the highest offense level of the counts in the Group.").

Mail fraud has a base offense level of 7. U.S.S.G. § 2B1.1(a)(1). 16 levels must be added for a loss between $1,500,000 and $3,500,000. U.S.S.G. § 2B1.1(b)(1)(I). Assuming for the moment the applicability of the gross receipts adjustment, an additional 2 levels are added.[3] U.S.S.G. § 2B1.1(b)(17)(A). And a further 2-level abuse of trust adjustment applies because Capps's position of trust at Vanguard significantly facilitated his mail fraud offense. U.S.S.G. § 3B1.3. Capps agrees that, had the PSR calculated the guidelines range for his mail fraud conviction, the adjustment for abuse of a position of trust would have applied to that offense level. The total adjusted offense level, then (before any reduction for acceptance of responsibility), is 27.

The base offense level for money laundering is the "offense level for the underlying offense from which the laundered funds were derived[.]" U.S.S.G. § 2S1.1(a)(1). Here, that is mail fraud, so the base offense level is, again, 7. U.S.S.G. § 2B1.1(a)(1). As with the mail fraud calculation, 16 levels must be added for a loss between $1,500,000 and $3,500,000, U.S.S.G. § 2B1.1(b)(1)(I), along with an additional 2 levels under the gross receipts adjustment, U.S.S.G. § 2B1.1(b)(17)(A), assuming it applies. For the

---

[3] Capps challenges the application of the gross receipts adjustment, and we address that challenge *infra*.

8

money laundering calculation, an additional 2 levels are added because Capps was convicted under 18 U.S.C. § 1956.[4] U.S.S.G. § 2S1.1(b)(2). That adds up to an adjusted offense level of 27, the same as the mail fraud offense level. But the PSR also added the 2-level adjustment for abuse of a position of trust, pursuant to U.S.S.G. § 3B1.3, bringing the total offense level (before any reduction for acceptance of responsibility) to 29. Consequently, the offense level for the grouped counts became that higher number, and his guidelines range was correspondingly increased. That's the problem. If the abuse of trust adjustment is inapplicable, the range is wrong.

In determining whether to apply the abuse of trust adjustment, we use a two-step inquiry. *United States v. Douglas*, 885 F.3d 124, 130 (3d Cir. 2018) (en banc). "First, we must determine whether the defendant actually occupied a position of public or private trust." *Id.* at 130. At that step, we "ask whether the defendant had the power to make decisions substantially free from supervision based on (1) a fiduciary or fiduciary-like relationship, or (2) an authoritative status that

_____

[4] Section 1956 of Title 18 is the money laundering statute that Capps pled guilty to violating. Specifically, he pled to violating 18 U.S.C. § 1956(a)(1)(B)(i), which provides, in pertinent part, that whoever launders funds "knowing that the transaction is designed in whole or in part … to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" shall face various penalties. The guideline for money laundering instructs that 2 levels should be added in calculating the guidelines range for defendants convicted under that statute. U.S.S.G. § 2S1.1(b)(2).

would lead his actions or judgment to be presumptively accepted." *Id.* at 133. "[I]f we conclude that the defendant did hold such a position," we reach the second step, where the question is "whether the defendant abused this position in a manner that significantly facilitated his crime." *Id.* at 130. (citation and internal quotation marks omitted). In answering that question, "courts should consider, among other things, whether the defendant's position allowed him to commit a difficult-to-detect wrong, and the defendant's authority vis-à-vis the object of the wrongful act. Courts may also consider whether the victim relied on the defendant's integrity, such that the victim became a more susceptible target for the defendant." *Id.* at 134.

Capps argues that the guidelines calculation contained in the PSR and adopted by the District Court violated Commentary Note 2(c) to the money laundering guideline, § 2S1.1, by incorrectly basing the application of the abuse of trust adjustment on his conduct in the underlying offense, the mail fraud. He insists that he had no position of trust with respect to the money laundering and so could not have abused it. On this record, he is correct.

Supporting the abuse of trust adjustment, the PSR said:

As a supervisor at Vanguard, the defendant stole the passwords of subordinates and used those passwords to access the Vanguard system used to issue checks and submit requests to have checks issued on certain dormant accounts, all in an effort to conceal his conduct. Capps then deleted and attempted to delete the record transactions in Vanguard's system related to the

10

> falsely submitted requests and improper approvals for checks issued by Vanguard on certain dormant accounts. The defendant abused a position of public or private trust in a manner that significantly facilitated the commission or concealment of the offense; therefore, the offense level is increased by two levels, pursuant to USSG §3B1.3.

(Presentence Report at 7.)

That justification for the adjustment would make perfect sense, if the count at issue were the mail fraud conviction. But it isn't. The PSR did not calculate the mail fraud guidelines range, though it should have.[5] It only calculated the range for the money laundering. According to the indictment, the factual basis for the money laundering charge is that Capps caused two checks to be issued to him by a co-conspirator, knowing that the property involved in those financial transactions represented the proceeds of the mail fraud.[6] His position at Vanguard was indeed "a position of public or private trust" that he abused to commit the fraud, but it was irrelevant to the

---

[5] The government does not contest that the PSR should have calculated the guidelines for both money laundering and mail fraud. (*See* Answering Br. at 10 ("Much of the analysis presented in the appellant's brief is correct: With the fraud and money laundering counts grouped, the court must determine the offense level applicable to each type of offense, and then apply to the group the higher of the two offense levels.").)

[6] The money laundering was charged in two counts, one for each check.

commission or concealment of the money laundering as charged in the indictment.

The government responds that the money laundering could not have happened but for the fact that Capps was able to direct the disbursement of funds from Vanguard. This is perfectly true, but beside the point. It is always the case with money laundering that the money came from some unlawful activity. By definition, that is a feature of money laundering. There is always an underlying crime. In Capps's case, the only abuse of a position of trust occurred in the fraud that generated the money to be laundered. The point of Commentary Note 2(c) is to keep the adjustments applicable to the criminal activity that generated the money from being applied to the conceptually distinct money laundering offense. In relying on the flawed PSR, the District Court failed to heed that separation, just as the government's argument invites us to make the same mistake now.

The government believes that *United States v. Sokolow*, 91 F.3d 396 (3d Cir. 1996), supports its position. The defendant there, the president and CEO of a corporation, collected money in premiums from insurance clients through a fraudulent scheme. *Id.* at 400. He converted some of those premiums for his personal benefit and laundered them through a number of bank and brokerage accounts, real property, and mortgages. *Id.* at 400-01. On appeal, we affirmed the application of the 2-level abuse of trust adjustment because "[i]t was within [the defendant's] authority to withdraw funds from [the corporation] and that authority was necessary for the commission of the money laundering offenses." *Id.* at 413. But *Sokolow* predates the adoption of U.S.S.G. § 2S1.1's Commentary Note 2(c) in 2001, so we had no occasion to

12

consider the question we do today. The separation between the underlying offense and the money laundering was simply not at issue.

It is at issue here, though, and the District Court erred in applying the 2-level abuse of trust adjustment to the money laundering offense calculation. Given the text of Commentary Note 2(c), we think the error is plain.[7]

---

[7] The other circuits that have addressed Commentary Note 2(c) have all explained that it dictates that any Chapter 3 adjustment must be based on the defendant's conduct in relation to the money laundering charge, not the underlying offense. *See United States v. Salgado*, 745 F.3d 1135, 1138 (11th Cir. 2014) ( "[The] application note's meaning for this case is straightforward: When the district court calculated [the defendant's] offense level under § 2S1.1(a)(1), it could base a role adjustment on his conduct in the money laundering conspiracy but not on his conduct in the underlying drug conspiracy."); *United States v. Rushton*, 738 F.3d 854, 859 (7th Cir. 2013) ("[T]he 2-level enhancement for abuse of trust … is permissible in a money laundering case—but only when the abuse of trust relates to the money laundering itself rather than to the underling offense (the offense that generated the money that the defendant laundered)."); *United States v. Keck*, 643 F.3d 789, 800-01 (10th Cir. 2011) (holding that a defendant's conduct in an underlying drug conspiracy cannot be used to apply Chapter 3 adjustments); *United States v. Byors*, 586 F.3d 222, 226-28 (2d Cir. 2009) (implicitly adopting the same interpretation); *United States v. Anderson*, 526 F.3d 319, 328 (6th Cir. 2008) (defendant ineligible for offense level reduction to money laundering guideline calculation based on her minimal role in the underlying drug conspiracy); *United States*

Without application of the abuse of trust adjustment to the offense level for the money laundering count, the offense level (again, before any reduction for acceptance of responsibility) for both the money laundering conduct and the mail fraud conduct is 27, not 29 as the District Court concluded. Thus, the sentencing range is different and, in keeping with the guidance of the Supreme Court and the record here, resentencing is in order. *See Molina-Martinez*, 136 S. Ct. at 1346 ("In most cases a defendant who has shown that the district court mistakenly deemed applicable an incorrect, higher Guidelines range has demonstrated a reasonable probability of a different outcome."); *Rosales-Mireles*, 138 S. Ct. at 1908 (explaining that a "reasonable citizen" would "bear a rightly diminished view of the judicial process and its integrity.") (quotation marks and citation omitted).[8]

## B.     The Gross Receipts Adjustment

In calculating the money laundering offense level, the District Court also applied the gross receipts adjustment, which calls for a 2-level adjustment when "the defendant derived

---

*v. Cruzado-Laureano*, 440 F.3d 44, 49 (1st Cir. 2006) ("[A]pplication note 2(C) to the money-laundering guideline provides that Chapter Three adjustments should be determined with reference to the money-laundering *offense* and not to the underlying offense[.]").

[8] Capps received a sentence well below the range the District Court had calculated. How, if at all, a resentencing affects his final sentence is a matter for the District Court on remand and our opinion today implies nothing about that.

14

more than $1,000,000 in gross receipts from one or more financial institutions[.]" U.S.S.G. § 2B1.1(b)(17)(A). Gross receipts "includes all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense." U.S.S.G. § 2B1.1 cmt. n.13(B). Capps advances two arguments in his effort to persuade us that the District Court erred in making that adjustment. First, he asserts that, in light of *United States v. Stinson*, 734 F.3d 180 (3d Cir. 2013), Vanguard should not be viewed as the source of the funds. Second, he says that a remand is appropriate because the District Court made inconsistent statements about the amount of the gross receipts, making it unclear whether his gross receipts met the $1 million threshold. He's wrong on the first point but right on the second.

## 1. The Source of the Funds

The sentencing guidelines' definition of "financial institution" is broad and expressly includes investment companies.[9] U.S.S.G. § 2B1.1 cmt. n.1. Vanguard is, as the

---

[9] "'Financial institution' includes any institution described in 18 U.S.C. § 20, § 656, § 657, § 1005, § 1006, § 1007, or § 1014; any state or foreign bank, trust company, credit union, insurance company, investment company, mutual fund, savings (building and loan) association, union or employee pension fund; any health, medical, or hospital insurance association; brokers and dealers registered, or required to be registered, with the Securities and Exchange Commission; futures commodity merchants and commodity pool operators registered, or required to be registered, with the Commodity Futures Trading Commission; and any similar

15

indictment recognizes, one of the world's largest investment companies. No contention has been made to the contrary. It thus clearly fits within the definition of a "financial institution," for purposes of § 2B1.1 of the guidelines.

It is also true that Vanguard has a property interest in the accounts it manages. Although its customers, the account holders, obviously have property rights in their funds, Vanguard too has a possessory property interest in them. The Supreme Court's decision in *Shaw v. United States*, 137 S. Ct. 462 (2016), explains that both account holders and financial institutions have property interests in funds held by the institutions. The context in *Shaw* was the theft of a depositor's funds in a scheme "to defraud a financial institution" in violation of 18 U.S.C. § 1344(1), and the Court explained that, even when a bank merely assumes possession of a customer's funds, "the bank is like a bailee, say, a garage that stores a customer's car. And as bailee, the bank can assert the right to possess the deposited funds against all the world but for the bailor (or, say, the bailor's authorized agent). This right, too, is a property right." *Id.* at 466 (citations omitted). Vanguard is not a bank, but it holds its account holders' funds in a fashion similar enough to a bank to warrant following the reasoning in *Shaw*. We thus conclude that, for purposes of § 2B1.1, Vanguard had a property interest in the funds in its possession.

Capps points to *Stinson* to argue that Vanguard's interest in the funds was nevertheless insufficient to apply the

---

entity, whether or not insured by the federal government." U.S.S.G. § 2B1.1 cmt. n.1.

gross receipts adjustment.[10]  But his understanding of that case is misguided.  In *Stinson*, we explained that

> a financial institution is a source of the gross receipts when it exercises dominion and control over the funds and has unrestrained discretion to alienate the funds.  A financial institution is not the source of all funds that have passed through the institution, as might occur during a simple wire transfer.  Accordingly, mere tangential effects on financial institutions will not support application of the enhancement.

734 F.3d at 186.

Although that language indicates the need for a significant degree of control over the funds at issue, we do not read it to mean that a financial institution's having less than the unrestrained right to treat the funds as its own means that crimes against the institution lie outside the reach of the gross receipts adjustment.  Here, Vanguard possessed the funds.  Its control of them was much more than the tangential control exercised by a bank handling a wire transfer.  *See Stinson*, 734 F.3d at 186.  In fact, Vanguard's dominion and control over the abandoned funds is what allowed Capps to commit his fraud: it was through his employment at Vanguard that he was able to identify and draw checks on abandoned accounts.

*Stinson*, rightly understood, asks for nuanced fact-finding.  The defendant in that case had a fraudulent scheme in

---

[10]  At the time, the provision was U.S.S.G. § 2B1.1(b)(15)(A); now, it is U.S.S.G. § 2B1.1(b)(17)(A).

17

which he set up a sham fund and used investors' money for a variety of personal business ventures. 734 F.3d at 181-82. As part of the fraud, the defendant entered into agreements with two independent financial advisory firms whereby the firms would refer investors to his sham fund in exchange for referral fees. *Id.* at 182. We said that, while some investors exercised "individual decisions to invest with [the sham fund] on the advice of their investment advisors at each firm[,] … some of the victim impact statements suggest that [the independent financial advisory firms] retained control over the assets of certain clients and invested in [the sham fund] on their behalf." *Id.* We remanded to the district court because, while the funds from individuals who made the decision to invest should not be considered under the adjustment, "we [we]re unable to conclude definitively that the enhancement d[id] not apply because the record [wa]s unclear as to whether [the independent financial advisory firms] invested any money on behalf of their clients." *Id.* at 187. We therefore recognized that a firm that invests client funds can exercise sufficient dominion and control over the funds to justify application of the gross receipts adjustment, even though the clients also had control over those funds.

Capps argues that Vanguard's control over the funds here was especially weak because the funds were due to escheat. He points to the Supreme Court's statement in *Delaware v. New York* that "[f]unds held by a debtor[, here, Vanguard, the holder of the funds,] become subject to escheat because the debtor has no interest in the funds[.]" 507 U.S. 490, 502 (1993). But, if anything, the fact that the money Capps stole was due to escheat strengthens the argument that Vanguard exercised the necessary dominion and control over them for the gross receipts adjustment to apply. *Delaware v.*

18

*New York* focused on which sovereign could lay claim to abandoned property. *Id.* The observation that the holder of the property, without an ownership interest in it, does not get to keep it was a statement about the relative rights of a sovereign and the holder of the abandoned property. It does not mean that, as the holder of funds before they escheat, institutions like Vanguard lack the ability to exercise dominion and control over them. On the contrary, Vanguard was the only one exercising dominion and control over the abandoned funds at issue here, until they escheated. Thus, it was not error – let alone plain error – for the District Court to conclude that the funds were derived from Vanguard.

## 2. The $1 Million Threshold

Commentary Note 13(A) to money laundering guideline § 2B1.1, states that "[f]or purposes of [the gross receipts adjustment], the defendant shall be considered to have derived more than $1,000,000 in gross receipts if the gross receipts to the defendant *individually*, rather than to all participants, exceeded $1,000,000." U.S.S.G. § 2B1.1(b)(17)(A) cmt. n.13(A) (emphasis added). Capps argues that we should remand to the District Court for clarification of inconsistent statements about whether he met the $1 million threshold on an individual basis.

The government does not try to say that the District Court's comments were clear but argues that the Court must have found that Capps met the threshold because "the loss in this case (which Capps was ordered to repay to Vanguard) is $2,137,580.81." (Answering Br. at 21 n.4.) According to the government, "[t]here is no question that the 'gross receipts' in this case – not Capps' personal receipts after dividing the

19

proceeds – was far over $1 million." (*Id.*) Even if true, that assertion manages to explicitly avoid the relevant question. It ignores the requirement from the commentary that the threshold must be applied in terms of what Capps himself received, individually.

The District Court's statements did not answer the relevant question either. During sentencing, the Court said, "Mr. Capps himself admitted just now that he took *approximately* one half of [approximately $2 million] or a million dollars" (App. at 96) (emphasis added), and that Capps stole "*almost* over a million dollars, or receiving a million dollars," (App. at 97) (emphasis added). Accordingly, we will remand so that the District Court can clarify whether the gross receipts that Capps received individually exceeded the million-dollar threshold.

## III. CONCLUSION

For the foregoing reasons, we will remand for resentencing.