**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 18-2683 & 18-2873
_____

UNITED STATES OF AMERICA

v.

COLISE HARMON
                    Appellant in No. 18-2683
_____

UNITED STATES OF AMERICA

v.

LEON LITTLE
                    Appellant in No. 18-2873
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Nos. 2-13-cr-00582-001 & 2-13-cr-00582-002)
District Judge:  Honorable Cynthia M. Rufe
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
November 9, 2022
_____

Before:  CHAGARES, Chief Judge, JORDAN, and SCIRICA, Circuit Judges

(Opinion filed: December 2, 2022)

_____

OPINION[*]

_____

CHAGARES, <u>Chief</u> <u>Judge</u>.

These two separate appeals, consolidated for purposes of disposition, arise from

guilty verdicts rendered after a jury trial on drug trafficking and related charges against

appellants Leon Little and Colise Harmon.  Little appeals various aspects of his

conviction and sentence, while Harmon challenges his conviction and sentence due to an

alleged conflict with his trial counsel.  For the following reasons, we will affirm the

judgments of conviction and sentence.

I.

We write solely for the parties and so recite only the facts necessary to our

disposition.  Harmon and Little were prosecuted for their involvement in a large-scale

oxycodone drug trafficking operation ("DTO") operating in Philadelphia.  The DTO's

modus operandi was to recruit and pay individuals to pretend to be legitimate medical

patients in order to obtain oxycodone prescriptions.  Then, the fake patients would

distribute their oxycodone pills to dealers and users.  Evidence uncovered as part of the

investigation into this DTO suggested that Little was the ringleader.  Harmon contributed

by, among other things, driving the fake patients to the doctor's office and pharmacies.

Little was charged with conspiracy to distribute controlled substances, multiple

_____

[*]     This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does
not constitute binding precedent.

counts of distribution of oxycodone and aiding and abetting that conduct, multiple counts of acquiring a controlled substance by fraud and aiding and abetting that conduct, engaging in unlawful monetary transactions and aiding and abetting that conduct, and, finally, multiple counts of money laundering and aiding and abetting that conduct. Harmon was charged with conspiracy to distribute controlled substances, as well as certain of the foregoing distribution of oxycodone and acquiring a controlled substance by fraud counts.

At trial, the prosecution relied in part on extensive testimony from the lead investigative agent, Special Agent Jeff Lauriha ("SA Lauriha"), who testified as both a lay and expert witness. The Government also presented, among other evidence, testimony from a drug dealer, fake patients, two of Little's senior lieutenants, the doctor's office receptionist who facilitated the scheme, and Little's wife. Little and Harmon were both convicted on all counts.

Little was sentenced, in relevant part, to 408 months of imprisonment, which was within the United States Sentencing Guidelines ("Guidelines") range of 360 months to 10,152 months of prison time but less than the 480 months sought by the Government. Little's sentence also included a two-level enhancement for obstruction of justice. The District Court imposed this enhancement based on an exchange between Little and another inmate, Jacob Mitchell, regarding the daughter of Little's co-conspirator, James Alexander. Alexander was cooperating with the prosecution and was thus separated from Little in prison. Little told Mitchell to pass along a message to Alexander telling him that his daughter had asked Little why she could not meet with Little and Alexander together.

The District Court deemed this to be witness intimidation.

Harmon was sentenced to 180 months of imprisonment. Following his conviction but prior to his sentencing, Harmon had written a pro se letter to the District Court claiming that his defense counsel had failed to inform him that the Government had sought a sentencing enhancement pursuant to 21 U.S.C. § 851 in November 2016 (the "§ 851 Notice"), which increased his statutory maximum sentence from 240 months to 360 months based on a prior felony drug offense. The District Court wrote back advising Harmon to discuss his concerns with his attorney. Harmon raised the issue again at his sentencing hearing. He claimed that he would have pled guilty had he known about the § 851 Notice. The District Court concluded that the sentencing proceedings were not the proper forum to consider Harmon's § 851 Notice allegations, though it did permit Harmon to make a record of his dissatisfaction with his counsel at multiple points during the sentencing hearing. Harmon's defense counsel continued to represent Harmon through sentencing and represents him in this timely appeal.

## II.[1]

### A.

We first consider Harmon's appeal. He challenges only the District Court's alleged failure to address adequately his attorney's purported conflict of interest, arising out of his post-trial assertions that counsel failed to inform him of the § 851 Notice. He claims that the District Court's failure on this front deprived him of his Sixth Amendment

---

[1] The District Court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231 and we have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

right to effective counsel. Ineffective assistance of counsel claims like this one, however, are generally "not cognizable in the first instance on direct appeal" and are better suited for review in collateral habeas proceedings where the record can be more fully developed. United States v. Morena, 547 F.3d 191, 198 (3d Cir. 2008).

Though we have recognized an exception to this general rule where "facts showing an actual conflict of interest are clear on the record," id. at 198, this is not such a case. Harmon's attorney did tell the court at sentencing "I don't know how I can continue to represent him . . . [h]e has just called me ineffective on the record," App. 116, but the rest of the record suggests that, following this exchange, Harmon and his attorney reached an understanding on how to proceed. In fact, Harmon has retained the same counsel on appeal.

Harmon's judgments of conviction and sentence will therefore be affirmed, without prejudice to his ability to raise his claims in a petition for collateral review.

B.

Little alleges that the District Court erred by: 1) permitting SA Lauriha to testify as both a lay and expert witness and admitting his summary testimony and charts; 2) imposing a sentencing enhancement for obstruction of justice; 3) imposing a substantively unreasonable 408-month sentence; and 4) sentencing Little on facts not proven beyond a reasonable doubt. Each of these claims will be addressed in turn. None are meritorious.

1.

Generally, a district court's decision regarding the admissibility of evidence is

reviewed for abuse of discretion. United States v. Green, 617 F.3d 233, 239 (3d Cir. 2010). An evidentiary issue that was not preserved, however, is reviewed for plain error. United States v. Fulton, 837 F.3d 281, 289 (3d Cir. 2016). "To demonstrate 'plain error' an appellant bears the burden of proving that: (1) the court erred; (2) the error was 'plain' at the time of appellate consideration; and (3) the error affected substantial rights, usually meaning that the error must have affected the outcome of the district court proceedings." United States v. Glass, 904 F.3d 319, 321 (3d Cir. 2018). "If those three prongs are satisfied, we have 'the discretion to remedy the error—discretion which ought to be exercised only if the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" United States v. Stinson, 734 F.3d 180, 184 (3d Cir. 2013) (quoting Puckett v. United States, 556 U.S. 129, 135 (2009)).

Little did not object to the District Court's handling of SA Lauriha's dual testimony as both a lay and expert witness, so we review for plain error. Little asserts that it was plain error to allow SA Lauriha to give dual testimony, particularly since the District Court did not instruct the jury on how to separate his dual roles.

The District Court's decision to allow SA Lauriha to serve as both a lay and expert witness without a specific jury instruction on dual capacity testimony was not plainly erroneous. In fact, it was not error at all. Dual capacity testimony is "routinely upheld, particularly where experienced law enforcement officers were involved in the particular investigation at issue. . . ." United States v. Tucker, 714 F.3d 1006, 1016 (7th Cir. 2013) (quoting United States v. York, 572 F.3d 415, 425 (7th Cir. 2009)). Little has identified, and we have found, no case law from this Court or any other requiring a dual capacity

6

witness jury instruction in every circumstance, though some courts have certainly deemed one advisable.  See United States v. Moralez, 808 F.3d 362, 366 (8th Cir. 2015) ("No circuit, it should be noted, has categorically prohibited the use of dual-role testimony by case agents, and failure to take these precautions has only occasionally merited reversal.").  To the contrary, some courts have explicitly concluded that such an instruction is not necessary where other safeguards against prejudice exist.  See, e.g., Tucker, 714 F.3d at 1016 (listing precautionary measures for dual capacity testimony).  These safeguards can include "a properly structured direct examination which makes clear when the witness is testifying as to facts or when he is offering his expert opinion, establishing the proper foundation for the expert component of the testimony, and allowing for the rigorous cross-examination of the dual capacity witness."  Id.

We are satisfied that adequate safeguards existed here.  SA Lauriha's expert testimony was separated temporally from his lay testimony, and the Government clearly indicated when it was transitioning into exploring his expert opinions.[2]  Little's counsel thoroughly cross-examined SA Lauriha after both stages of his testimony.  The District Court gave fulsome jury instructions pertaining to the treatment of SA Lauriha's expert testimony as well, further curbing the risk that the jury might give his testimony undue

---

[2] It is true that certain aspects of SA Lauriha's examination – such as the Government's decision to lay the extensive foundation for his expert opinions prior to his lay testimony, instead of leaving this potentially prejudicial background for the immediate lead up to his testimony as an expert – did not always navigate the line between lay and expert testimony perfectly.  But the fact that "dual capacity testimony could have been more deftly conducted" does not necessitate reversal if other safeguards sufficiently insulate the jury against the risk of prejudice.  Tucker, 714 F.3d at 1016.

import.

Even if the absence of a dual capacity witness instruction here were error, it would not be "plain." For an error to be "plain," it must be "clear or obvious." United States v. Davis, 985 F.3d 298, 308 (3d Cir. 2021). There was nothing "clear or obvious" about applying a dual capacity jury instruction in this case. Little, for his part, failed to request a cautionary instruction, and there is no authority from this Court addressing, let alone requiring, one. Little argues that we may find an error to be "plain" even in the absence of controlling Third Circuit precedent so long as precedent from other jurisdictions is sufficiently clear, but the varied body of jurisprudence addressing this kind of jury instruction is anything but. As previously noted, no court has universally required a cautionary jury instruction, and many have looked to other safeguards of the type that existed here.[3] Any error in not providing a dual capacity jury instruction was thus not "plain" in nature.

Nor has Little met the third prong of the "plain error" analysis: whether the error affected substantial rights. The Government presented extensive other evidence establishing Little's guilt – including direct testimony from a wide array of co-conspirators – alongside SA Lauriha's testimony. Given this wealth of alternative proof supporting Little's conviction, any error here as to SA Lauriha's testimony is not likely to

---

[3] In fact, one court has even concluded that a cautionary instruction on dual capacity witness testimony can do more harm than good. See United States v. Moreland, 703 F.3d 976, 983–84 (7th Cir. 2012) ("Telling the jury that a witness is both a lay witness and an expert witness and will be alternating between the two roles is potentially confusing— and unnecessary.").

"have affected the outcome of the district court proceedings." Glass, 904 F.3d at 321.

Little has therefore failed to satisfy any of the three "plain error" prongs. The District

Court's handling of the dual capacity testimony was not plainly erroneous.

We consider, next, whether the District Court abused its discretion in admitting

SA Lauriha's summary testimony and charts.[4] This challenge primarily centers on four

charts SA Lauriha created drawing connections between thousands of phone records and

members of the DTO, as well as his testimony associated with the charts. Little suggests

this summary evidence was misleading, inaccurate, unduly prejudicial, and compounded

the alleged intermingling of fact and expert testimony. These concerns are unavailing.

Courts must undoubtedly be cautious when admitting evidence summaries, but

such summaries can be very helpful to juries where, as here, voluminous or complex

evidence is involved. To this end, "[i]t is hard to imagine an issue on which a trial judge

enjoys more discretion than as to whether summary exhibits will be helpful." Fraser v.

Major League Soccer, L.L.C., 284 F.3d 47, 67 (1st Cir. 2002). The District Court here

exercised this discretion with care, closely scrutinizing the charts and at several points

requiring the Government to modify them for clarity and to lay further foundation for

them prior to admission. Little's counsel then thoroughly cross-examined SA Lauriha on

the charts, including on some of the same alleged issues with them that Little raises on

appeal, and highlighted purported inconsistencies with them in his closing argument.

---

[4] The parties disagree over whether Little appropriately preserved his objections on this front and, thus, which standard of review to use. We will afford Little the benefit of the doubt and apply the abuse of discretion standard.

Finally, the District Court gave a cautionary jury instruction specifying that the summary charts were not evidence or proof. The District Court thus acted within its discretion in admitting these summary charts as well as SA Lauriha's testimony related to them.[5]

2.

Next, we turn to Little's claim that the District Court erroneously imposed a sentencing enhancement for obstruction of justice. The parties disagree over the appropriate standard of review. We "review factual findings relevant to the Guidelines for clear error and . . . exercise plenary review over a district court's interpretation of the Guidelines." United States v. Grier, 475 F.3d 556, 570 (3d Cir. 2007) (en banc). Little asserts that this appeal falls into the latter category and warrants de novo review, but his disagreement with the District Court is entirely fact-based. He does not challenge the District Court's interpretation of the meaning of any Guidelines definition or term, but rather with its interpretation of Little's conduct. Thus, clear error review is warranted. See United States v. Richards, 674 F.3d 215, 219 (3d Cir. 2012) ("[A] more deferential standard of review is appropriate where, as here, we consider a district court's application of the Guidelines to a specific set of facts, that is, where the district court determined whether the facts 'fit' within what the Guidelines prescribe.").[6]

---

[5] Little also briefly mentions two additional charts reviewed by SA Lauriha at trial, which linked certain evidence to parts of the indictment. Little's barebones assertions on this front fail for the same reasons his phone record summary chart claims do.

[6] Little's citation to United States v. Bell, 947 F.3d 49, 54 (3d Cir. 2020), which distinguished Richards, is not to the contrary. Bell centered on the meaning of the term "physical restraint" and whether it encompassed a certain type of restraint. Id. at 55–61. Here, Little does not contest the meaning of any Guidelines term, but rather disputes what

Under the clear error standard of review, a factual finding "will not be overturned unless it is (1) completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data." United States v. Williams, 898 F.3d 323, 332 (3d Cir. 2018) (quotations marks omitted). Applying that deferential standard here, Little's arguments fall short. While the relevant interaction between Little and the other inmate, Mitchell, appears innocuous enough on the surface – there is nothing overtly threatening about asking Mitchell to pass along a message to Little's co-conspirator Alexander – context renders the District Court's conclusion that this was "classic intimidation of a witness," App. 1328, eminently reasonable. Little's message was that he had met with Alexander's daughter and that the daughter had asked why she could not meet with Little and Alexander together. The reason Little and Alexander could not meet Alexander's daughter together was because Alexander was cooperating with the prosecution against Little. Thus, Little's message threatened that he 1) knew that Alexander was cooperating against him and 2) had access to Alexander's daughter. Such a conclusion does require some reading between the lines, but it is precisely this sort of factual assessment that the District Court is best positioned to make, having had the opportunity to assess fully the credibility of the relevant witnesses. The District Court made thorough findings of fact to this end, and we will not disturb them here given the deference afforded its judgment.

3.

---

happened – whether his communication to Mitchell was actually an attempt to intimidate a witness or not. His appeal is therefore far afield from Bell.

11

Little next challenges the substantive reasonableness of his 408-month sentence. He claims that the District Court erroneously sentenced him to consecutive maximum terms of imprisonment for drug trafficking and money laundering because those counts are "essentially part of the same criminal offense." Little Br. at 41. He also argues that this unreasonableness was compounded by the fact that the sentence was much longer than any sentence previously imposed on Little. Neither of these arguments suffice to carry his burden of proving substantive unreasonableness, particularly considering the deference we owe to the District Court's determination that this sentence was warranted. See Gall v. United States, 552 U.S. 38, 51 (2007) (explaining that an appellate court must "give due deference" to the final sentence determination, in part because "the sentencing judge is in a superior position to find facts and judge their import").

Little's sentence does not violate the Guidelines policy of "imposing incremental punishment only for significant additional criminal conduct." See United States v. Velasquez, 304 F.3d 237, 246 (3d Cir. 2002) (quotation marks omitted). Drug trafficking and money laundering are substantively distinct conduct. Even where a drug dealing operation encompasses both, the facts underlying the drug dealing aspect of the operation do not necessarily overlap with the facts underlying the money laundering aspect of the operation.[7] Reflecting this distinction, the two offenses are codified in different titles of the criminal code and addressed in separate sections of the Guidelines. Put simply, the

---

[7] The Government suggests that this was precisely such a case where the money laundering and drug dealing activities were separated, and Little does not challenge this contention. To this end, Little's money laundering accomplice, his wife Aminah Shabazz, testified that she was not involved with the DTO's pill trafficking.

12

two types of conduct are not "realistically indistinct" in the sort of way that might suggest that the District Court unreasonably imposed incremental punishment.  Cf. id. at 246.

Little's complaint that his sentence is 30 years longer than any other prior sentence imposed on him fares no better.  The District Court provided a multifaceted justification for its sentencing decision.  Its reference to Little's prior sentences and the need for specific deterrence does not require it to engage in a comparative analysis explicitly articulating why the increased sentence here was appropriate.  Justification for the increase is implicit in the thorough reasoning the District Court provided.  And, even if we were to give weight to Little's complaints about the significant jump in sentence length compared to his prior terms of imprisonment, "[t]he fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court."  Gall, 552 U.S. at 51.

### 4.

Little claims, finally, that his constitutional rights were violated when he was sentenced based on judicial factfinding not proven beyond a reasonable doubt.  But, as he recognizes, precedent authorizes a district court to base its Guidelines sentencing calculation on facts found by the court by a preponderance of the evidence.  United States v. Grier, 475 F.3d 556, 563–68 (3d Cir. 2007) ("Judicial factfinding in the course of imposing a sentence within the permissible [Guidelines] range does not offend the Fifth and Sixth Amendment rights to a jury trial and proof beyond a reasonable doubt.").  Little's constitutional challenge is thus unavailing.

## III.

For the foregoing reasons, we will affirm the judgments of conviction and sentence of both Little and Harmon.