[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-11248
_____

D.C. Docket No. 1:16-cr-20390-BB-1

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

GERTI MUHO,

Defendant–Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(October 22, 2020)

Before MARTIN and NEWSOM, Circuit Judges, and WATKINS,* District Judge.

_____

    * Honorable W. Keith Watkins, United States District Judge for the Middle District of Alabama, sitting by designation.

WATKINS, District Judge:

Gerti Muho was convicted for bank fraud, wire fraud, aggravated identity theft, and money laundering. He was sentenced to 264 months of incarceration. Muho appeals his conviction and the sentence imposed by the district court. After careful review, and with the benefit of oral argument, we affirm the district court as to both the conviction and sentence.

I.

After graduating from law school, Gerti Muho began working for Fletcher Asset Management (FAM), an investment firm. FAM had a number of subsidiary and related entities, including RF Services and Soundview Elite, Ltd. Muho's role granted him access to the personal information of current and former employees and interns of the firms.

In April 2013, Muho resigned from his positions at FAM, Soundview Elite, and other entities. He then used a series of fraudulent documents purporting to re-establish his own authority and, in turn, to take control of FAM's entities using Leveraged Hawk, a shell company that he controlled. Among his many misdeeds, he eventually convinced a bank, HSBC-Monaco, that he had legal authority to execute financial transactions on behalf of Soundview Elite (which he did not)— inducing HSBC-Monaco to wire transfer more than $2 million from Soundview Elite's account to Leveraged Hawk's account with another bank.

2

Muho was first indicted in May 2016.  In September 2016, a grand jury returned a 40-count second superseding indictment charging him with bank fraud, in violation of 18 U.S.C. § 1344 (Counts 1–17); wire fraud, in violation of 18 U.S.C. § 1343 (Counts 18–19); aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1) (Counts 20–37); and money laundering, in violation of 18 U.S.C. § 1957 (Counts 38–40).

Muho's case involved a number of trial and sentencing rulings that are relevant here.  First, Muho was represented by a rotating cast of attorneys.  While represented by his third attorney, David Harris, he moved for leave to proceed *pro se* with Harris as standby counsel.  After a hearing, Muho's request was granted.  Second, Muho, proceeding *in forma pauperis*, moved the court to waive costs and issue subpoenas for eight witnesses under Federal Rule of Criminal Procedure 17(b).  As relevant to this appeal, the court granted the motion as to all but two witnesses; as to those two, the motion was denied without findings or explanation.

After an eleven-day trial and less than three hours of jury deliberation, Muho was convicted on all charges.  He was sentenced to 264 months' imprisonment: 240 months as to Counts 1–19 and 120 months as to counts 38–40, to be served concurrently; 24 months as to Counts 20–37, to be served concurrently with each other and consecutively to the remaining counts; and five years of supervised release.  In calculating Muho's sentence, the court applied a two-level

3

enhancement under U.S.S.G. § 2B1.1(b)(16)(A), which applies if "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense."

On appeal, Muho raises four issues:

(1) Whether the district court erred in not reinstating counsel for Muho despite his valid invocation of his right to self-representation;

(2) Whether the district court abused its discretion in denying, in part, Muho's Fed. R. Crim. P. 17(b) motion;

(3) Whether the district court erred in applying a two-level sentencing enhancement for deriving more than $1,000,000 from a financial institution where Muho fraudulently induced a bank to transfer funds from another customer's account; and

(4) Whether the district court imposed a sentence that was substantively unreasonable.

## II.

### A. Failure to Appoint Counsel

Muho argues that the district court erred by allowing him to proceed *pro se*—that is, by not *sua sponte* reinstating counsel for Muho—after he invoked his right to self-representation.

4

Muho cycled through a number of attorneys before moving for leave to proceed *pro se* with his then-attorney, David Harris, as standby counsel, in January 2017. The government responded by requesting a *Faretta* hearing.[1] There, the court informed Muho that he lacked a constitutional right to standby counsel. Muho reiterated his desire to push forward, confirming that he understood the risks, believed himself capable, and had no diagnoses of mental illness. The court found that Muho had voluntarily, knowingly, and intelligently waived his right to counsel and was competent to proceed *pro se*. Muho did. Although he periodically appeared to reconsider, Muho reaffirmed (and the court recognized, after correctly questioning Muho to confirm) his desire to represent himself on numerous occasions.

On appeal, Muho does not contest that he validly waived his right to counsel. Rather, he argues that he "was deprived of his right to a fair trial when he was allowed to continue to represent himself, even after he vacillated about self-representation . . . ." Muho is wrong.

---

1. *Faretta* urged that a defendant be "made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta v. California*, 422 U.S. 806, 835 (1975) (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)). Our Circuit has understood this language "to mean that ideally a trial court should hold a hearing to advise a criminal defendant on the dangers of proceeding *pro se* and make an explicit finding that he has chosen to represent himself with adequate knowledge of the possible consequences." *Nelson v. Alabama*, 292 F.3d 1291, 1295 (11th Cir. 2002). These hearings are often referred to as "*Faretta* hearings."

The Sixth Amendment to the United States Constitution guarantees familiar rights to a criminal defendant:  "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  But "[t]he Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants *to the accused personally* the right to make his defense."  *Faretta v. California*, 422 U.S. 806, 819 (1975) (emphasis added).  Accordingly, a criminal defendant has a "constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so."  *Id.* at 807.

*Faretta* protects an individual's right to self-representation despite the possible downsides.  "It is the defendant . . . who must be free personally to decide whether in his particular case counsel is to his advantage.  And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'"  *Id.* at 834 (quoting *Illinois v. Allen*, 397 U.S. 337, 350–351 (1970) (Brennan, J., concurring)).  *Faretta* and subsequent caselaw make clear that, while a court *may* terminate a defendant's self-representation, that action is discretionary.  *See, e.g.*, *id.* at 834 n.46 ("[T]he trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct.").  On the other hand, this Court has explicitly recognized that "a trial court can commit reversible constitutional error . . . by denying a proper assertion of the right to represent

6

oneself, and thereby violating *Faretta*." *Cross v. United States*, 893 F.2d 1287, 1290 (11th Cir. 1990).

Put simply, the trial court's failure to override *sua sponte* the defendant's waiver of his right to counsel—where, as here, the waiver's validity was clear, uncontested on appeal, and repeatedly reaffirmed after signs of uncertainty—is due to be affirmed.[2]  To find otherwise would contradict a "nearly universal conviction, on the part of our people as well as our courts, that forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." *Faretta*, 422 U.S. at 817.  Muho's arguments to the contrary are unpersuasive.  He is not entitled to relief on this issue.

### B. Denial of Subpoenas After Rule 17(b) Motion

Muho also argues that the district court abused its discretion in denying, in part, his motion under Federal Rule of Criminal Procedure 17(b).  Proceeding *in forma pauperis*, Muho asked the court to waive costs and issue subpoenas for eight witnesses under Rule 17(b).  In his motion, Muho explained the relevance of two

---

2. Typically, review of a waiver of right to counsel would be *de novo*.  *See, e.g.*, *United States v. Garey*, 540 F.3d 1253, 1268 (11th Cir. 2008) (noting that whether waiver of counsel was knowing and voluntary is "a mixed question of law and fact which this Court reviews *de novo*").  Here, however, Muho did not raise the issue below, which would ordinarily trigger plain error review.  *See, e.g.*, *United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir. 2005).  We have not resolved the appropriate standard in such a context: "No published case in this Circuit explicitly addresses the question, though the mine run of cases apply *de novo* review without discussing whether a defendant formally objected at trial."  *United States v. Stanley*, 739 F.3d 633, 644 (11th Cir. 2014).  We need not resolve this issue here; under either standard, the district court is due to be affirmed.

7

of these witnesses—Dr. Eli Shalenberger and Justice James Vaughn of the

Delaware Supreme Court—as follows:

> Defendant's third witness is Eli Shalenberger, Defendant's psychiatrist between 2012 and 2015. Defendant needs and expects Mr. Shalenberger to testify that Defendant's intentions were not to defraud his hedge funds but to save them from misuse and to comply with the law. This will negate that Defendant perpetrated a fraud scheme and that Defendant used proceeds of fraud to engage in monetary transactions. Defendant also expects Mr. Shalenberger to testify as to Defendant's state of mind from his conversations with the Defendant relating to all counts of the case. Absent Mr. Shalenberger's testimony, Defendant will not be able to prove or show his defense to the jury of the charged counts in this case.

> Defendant's fourth witness is Justice Vaughn of the Delaware Supreme Court. Defendant needs and expects Justice Vaughn to testify about the contents of an unrecorded telephone conference on a case arising from the dispute of control of Defendant's hedge funds that Defendant needs to show and prove [to] the jury his intention not to defraud his hedge funds, engage in a fraud scheme, or engage in monetary transactions from criminal funds, and that will establish and support Defendant's defense regarding his intentions and motives for all charged counts of the case. Without Justice Vaughn, Defendant will not be able to show or prove to the jury that Defendant was the victim set up by actors of said conference in their attempt to wrest away Defendant's control over his hedge funds and that Defendant lacked criminal intent for all the charged counts of the case.

The court granted Muho's motion for all witnesses except these two—as to whom

the motion was denied without explanation.

This court reviews the denial of a Rule 17(b) motion for abuse of discretion.

*See United States v. Rinchack*, 820 F.2d 1557, 1566 (11th Cir. 1987) ("The grant or

denial of a Rule 17(b) motion is committed to the discretion of the district court

8

and is subject to reversal on appeal only upon a showing of abuse of that discretion."). "A district court abuses its discretion if it fails to apply the proper legal standard or to follow proper procedures in making the determination, or makes findings of fact that are clearly erroneous." *United States v. Izquierdo*, 448 F.3d 1269, 1276 (11th Cir. 2006) (internal quotation marks and citation omitted). If the evidentiary ruling was in error, the harmless error standard applies. *United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005). That is, a decision constitutes *reversible* error only if it "ha[s] a 'substantial influence' on the outcome of a case or leave[s] 'grave doubt' as to whether [it] affected the outcome of a case." *United States v. Frazier*, 387 F.3d 1244, 1266 n.20 (11th Cir. 2004) (en banc) (alterations added).

Rule 17(b) allows indigent defendants to subpoena a witness at the government's expense whose presence is a "necessity" to an "adequate defense." But the Rule places the burden on the defendant: "[A] defendant making a Rule 17(b) request bears the burden of articulating specific facts that show the relevancy and necessity of the requested witness's testimony." *Rinchack*, 820 F.2d at 1566. Courts considering a Rule 17(b) request may also consider the materiality, competency, and timeliness of the request. *See id.* "The appellate courts have upheld the refusal of district courts to issue a Rule 17(b) subpoena where the request was untimely, the testimony sought was cumulative, or the defendant failed

9

to make a satisfactory showing of indigency or necessity." *Id.*; *see also United States v. Link*, 921 F.2d 1523, 1528 (11th Cir. 1991) (summarizing the valid considerations of courts considering a request made under Rule 17(b)).

Muho correctly points out that the district court provided no rationale, and made no factual findings, when it denied the two requests. Findings would have been helpful. But even without such findings, this Court can affirm based on its own review of the record if it finds that the rejection was proper. *See, e.g.*, *United States v. Gill*, 864 F.3d 1279, 1280 (11th Cir. 2017) ("[W]e can affirm the district court's judgment on any ground supported by the record—even if that ground was not considered or advanced in the district court.").

Upon an independent review of the record, the trial court did not err in denying the Justice Vaughn request. Muho's proffer described testimony that involved an unrecorded phone call between unidentified persons about unspecified facts. It further asserted that the phone call would support certain conclusions regarding Muho's intent. But Muho's proffer failed to indicate what *facts* supported the conclusions, and it did not indicate why or how the evidence would be relevant or admissible over hearsay or other objections. These assertions fell short of meeting Muho's burden to articulate "*specific facts* that show the relevancy and necessity of the requested witness's testimony." *Rinchack*, 820 F.2d at 1566 (emphasis added).

Turning to Dr. Shalenberger, Muho stated that this witness would testify that Muho's "intentions were not to defraud his hedge funds" and about his "state of mind . . . relating to all counts of the case"—a possible violation of Federal Rule of Evidence 704(b). Although Rule 704(b) forbids expert testimony on the *ultimate* issue in a case, a defendant may seek testimony from a psychiatrist regarding his diagnosis, the particulars of a mental disease or defect, and his opinion as to a defendant's mental state. *See United States v. Manley*, 893 F.2d 1221, 1223 (11th Cir. 1990).

Again, Muho has not made the requisite showing; he has not demonstrated specific facts or admissible opinions from this witness that show relevancy and necessity. Where a defendant does not meet his required burden, we have upheld denials even when it is alleged that the court failed to make a relevant inquiry. *See, e.g.*, *Rinchack*, 820 F.2d at 1568 ("Although Rinchack argues that the district court erred in not inquiring into what the two men might be expected to testify, the law is crystal clear that the burden of showing necessity and relevance is on the defendant."). The trial court did not abuse its discretion in denying the Shalenberger subpoena.

In any event, any purported error was harmless. Muho was convicted quickly and under a great weight of evidence. After a trial lasting eleven days, the jury deliberated for less than three hours before convicting Muho on all counts.

11

Further, as he concedes, Muho was able to present the lack-of-intent defense allegedly supported by the two witnesses. And, finally, nothing in the relevant proffer or in Muho's appellate briefing indicates that the testimony, if allowed and admissible, would have substantially improved his case or his chances of a different verdict. Given these facts, "we do not harbor a grave doubt that the jury would have changed its verdict," *Henderson*, 409 F.3d at 1300, if these two witnesses had testified. We find no error that "affect[ed] a substantial right" of Muho. *Frazier*, 387 F.3d at 1266 n.20 (alterations added).

### C. Application of Sentencing Enhancement

Muho argues that the district court wrongly applied a two-level enhancement in calculating his sentence. Again—although in a case of first impression—he is incorrect.

The United States Sentencing Guidelines provide a two-level enhancement when "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." U.S.S.G. § 2B1.1(b)(16)(A) (2016 ed.).[3] "Gross receipts from the offense" is defined as "all property . . . which is obtained directly or indirectly as a result of [the] offense." *Id.* § 2B1.1 cmt. n.12(B) (2016 ed.); U.S.S.G. § 2B1.1 cmt. n.13(B) (2018 ed.). We review *de*

---

3. This enhancement is currently codified at U.S.S.G. § 2B1.1(b)(17)(A). Below, for the sake of clarity, the enhancement is referred to as the § 2B1.1(b)(16)(A) enhancement.

*novo* whether this enhancement applies. *United States v. Rodriguez*, 732 F.3d 1299, 1305 (11th Cir. 2013) (noting that this Court "reviews *de novo* the interpretation and application of the Guidelines").

HSBC-Monaco's status as a financial institution is uncontested, but this Circuit has not explicitly interpreted what it means to "derive[]" receipts from a financial institution in this context. It is no small project. Section 2B1.1 of the Guidelines applies to a broad range of criminal conduct including larceny, embezzlement, and other forms of theft; offenses involving stolen property and property damage or destruction; fraud and deceit; forgery; and offenses involving altered or counterfeit instruments. In turn, these broad categories encompass bank fraud, college scholarship fraud, Ponzi schemes, health care fraud, and a host of other wrongs. Even when limited to property[4] taken from financial institutions, the range of entities is vast.[5] Crafting a standard that applies universally is all but impossible.

---

4. We use the term "property" to refer to "gross receipts" as defined in the Guidelines. U.S.S.G. § 2B1.1 cmt. n.12(B) (2016 ed.); U.S.S.G. § 2B1.1 cmt. n.13(B) (2018 ed.).

5. The relevant Guideline defines "financial institution" as "any institution described in 18 U.S.C. § 20, § 656, § 657, § 1005, § 1006, § 1007, or § 1014; any state or foreign bank, trust company, credit union, insurance company, investment company, mutual fund, savings (building and loan) association, union or employee pension fund; any health, medical, or hospital insurance association; brokers and dealers registered, or required to be registered, with the Securities and Exchange Commission; futures commodity merchants and commodity pool operators registered, or required to be registered, with the Commodity Futures Trading Commission; and any similar entity, whether or not insured by the federal government. 'Union or employee pension fund' and 'any health, medical, or hospital insurance association,' primarily include large pension funds that serve many persons (*e.g.*, pension funds of large national and

But we are not dealing with the economic universe here. Our factual starting point is a specific spot on the financial map: financial institutions that exercise control over the property of others. Muho argues that the government had to prove that HSBC-Monaco owned, invested, or otherwise had unrestrained discretion to alienate its depositor's funds in order for the enhancement to apply. He asserts that Soundview Elite's status as depositor renders HSBC-Monaco's control over the funds irrelevant. The government counters that, by tricking the bank into transferring Soundview's funds to Muho's account at another bank, Muho stole from a bank account over which he had no authority and over which the bank exercised control.

We hold today that, to trigger the § 2B1.1(b)(16)(A) enhancement, at least in a case involving property held by a financial institution for a depositor, the financial institution (1) must be the *source* of the property, which we interpret as having property rights in the property, and (2) must have been *victimized* by the offense conduct. These two requirements follow straightforwardly from the Guideline's text—that the defendant's gross receipts be (1) "derived . . . from" a financial institution (2) "as a result of the offense." Because of the broad range of conduct to which § 2B1.1 applies, this standard may not be a perfect fit for all

---

international organizations, unions, and corporations doing substantial interstate business), and associations that undertake to provide pension, disability, or other benefits (*e.g.*, medical or hospitalization insurance) to large numbers of persons." U.S.S.G. § 2B1.1 cmt. n.1.

14

possible scenarios under this Guideline.  However, it fits typical banking practices involving funds held by banks for depositors.  We will discuss the elements of this standard in turn.

The words "derived . . . from" must be given their plain and ordinary meaning.  *United States v. Tham*, 118 F.3d 1501, 1506 (11th Cir. 1997).  To "derive" means "[t]o receive, as from a source . . . ; to obtain . . . by transmission." *Webster's New International Dictionary* (2d ed. 1934).  Thus, "derived . . . from" calls for identification of the *specific* source of the property.  *See United States v. Stinson*, 734 F.3d 180, 184 (3d Cir. 2013) (first citing *Black's Law Dictionary* 444 (6th ed. 1990); and then citing *Webster's Ninth New Collegiate Dictionary* 342 (1986)).  "Source" means that the financial institution, before the offense conduct, possesses and controls the property to be filched:  the "from" in "derived from."  In shorthand, the financial institution "holds" the property.  To clarify the source requirement and its application here, some elementary background on banks—and their relationship to the property they hold—is in order.  We all use banks in our daily lives, but what exactly does a bank do?  As Merriam-Webster defines it, a bank is "an establishment for the custody, loan, exchange, or issue of money, for the extension of credit, and for facilitating the transmission of funds."  *Bank*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/bank (last

visited Oct. 22, 2020).  Typical banking involves third-party financial arrangements between a bank and its customers—usually depositors or borrowers.

In facilitating those transactions, the bank either takes a non-exclusive property interest in another's (the depositor's) property or holds the property with contractual instructions in the nature of a bailment.  Either arrangement gives the bank possession of and a measure of control over the property.  *See Shaw v. United States*, 137 S. Ct. 462, 466 (2016).  It may be property held in an ordinary deposit account, in trust, or in a safe deposit box or other storage arrangement (say, valuable art), or it may be property that has been foreclosed upon or repossessed and that is awaiting disposition.  Thus, money deposited in a bank by a third-party depositor is *property* necessarily involving *property rights*.

*Shaw* is instructive here because it rejects the argument that Muho now makes—namely, that full ownership is required.  *Shaw* involved a prosecution under 18 U.S.C. § 1344 for defrauding a financial institution.  Section 1344 makes it unlawful for anyone to "knowingly execute[] . . . a scheme . . . to obtain any of the moneys . . . owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1344(2).  Shaw wrongfully took money from the deposit account of another depositor at the bank by means of deception of the bank, much the same as Muho's conduct here.  Shaw argued that the statute does not cover

16

schemes to deprive a bank of customer deposits; it only covers the taking of the

bank's own property.  The Supreme Court disagreed.  "The basic flaw in this

argument lies in the fact that the bank, too, had *property rights* in Hsu's [the other

depositor's] bank account."  *Shaw*, 137 S. Ct. at 466 (emphasis added) (alterations

added).  The Court likened such arrangements to a bailment:

> [A]s bailee, the bank can assert the right to possess the deposited
> funds against all the world but for the bailor . . . .  This right, too, is a
> property right. . . .  Thus, Shaw's scheme to cheat Hsu was also a
> scheme to deprive the bank of certain bank property rights.

> Hence, for purposes of the bank fraud statute, a scheme
> fraudulently to *obtain* funds from a bank depositor's account normally
> is also a scheme fraudulently to *obtain* from a "financial institution," at
> least where, as here, the defendant knew that the bank held the deposits,
> *the funds obtained came from* the deposit account, and the defendant
> misled the bank *in order to obtain those funds*.

*Id.* (emphasis added).  We see no difference, in the context of a bank holding

deposited funds for a third party, in "obtaining" funds (statute) and "deriving"

funds (guideline) from a financial institution.  In defining "gross receipts," the

Sentencing Commission said as much:  "all property . . . which is *obtained* directly

or indirectly as a result of [the] offense."  § 2B1.1 cmt. n.13(B) (2018 ed.)

(emphasis added).  In both cases, the source of the funds is the bank.

Importantly, the financial institution as a "source" need not have full

ownership of the property.  Our perspective recognizes the routine practices of

many financial institutions, like banks, which exercise varying degrees of

dominion or control over property that is technically owned by others.  Had the Sentencing Commission intended for this enhancement to apply solely to property "owned by" a financial institution, it would likely have employed the terms "owned by" or "belonging to" rather than "derived . . . from."  *Cf. Loughrin v. United States*, 573 U.S. 351, 366 n.9 (2014) ("[T]he broad language in § 1344(2) describing the property at issue—'property owned by or under the custody or control of' a bank—appears calculated to avoid entangling courts in technical issues of banking law about whether the financial institution or, alternatively, a depositor would suffer the loss from a successful fraud.") (citation omitted).

Muho relies on the Third Circuit's decision in *Stinson*.  In that case, which did not involve banking at all, but rather investment companies as financial institutions, the Third Circuit held that "[a] financial institution is a source of a defendant's gross receipts if it owns the funds," and it defined ownership as "exercis[ing] dominion and control over the funds and ha[ving] unrestrained discretion to alienate the funds."  734 F.3d at 186.  Muho's suggestion—that ownership of the property determines from whom it was "derived"—is inconsistent with the plain language of the Guidelines and with modern banking practices.

The *Stinson* Court, despite its definition of "source," did not resolve the issue consistently with its own definition.  There, the fraudster, Stinson, used fictitious marketing materials to induce two legitimate investment firms,

18

Brentwood and TWM, to market his fraudulent enterprise to investors. Brentwood and TWM were financial institutions, which formed the basis for the guideline application. The key distinction in *Stinson* for our purposes was made by the Court itself. On the record before it, the Court could not say whether the investment firms only advised their clients to invest directly with Stinson, or whether the investment firms *"retained control over the assets of certain clients and invested . . . on their behalf." Id.* at 182 (emphasis added). Stinson argued "the money flowed from individual investors, not financial institutions like Brentwood and TWM." *Id.* at 183. In a telling conclusion, the Court admitted: "[W]e are unable to conclude definitively that the enhancement does not apply because the record is unclear as to whether Brentwood or TWM *invested any money on behalf of their clients. The record as developed on remand may indeed support application of the enhancement." Id.* at 187 (emphasis added).

Thus, *Stinson* did not hold that the financial institution had to be the *sole* owner of the funds obtained by fraud, and it remanded the case for the trial court to resolve the source of some of the funds. If the financial institution controlled or possessed investor funds with the "unrestrained discretion" to invest them on behalf of the investor, *id.* at 186, *Stinson* suggests that the enhancement would apply even in spite of a potential finding on remand that the financial institution

19

did not actually own the funds in question.[6]  Accordingly, *Stinson* does not carry the freight of Muho's argument.

Finally, to establish the financial institution as the source of the derived funds, the sentencing court must find that the relevant property flowed directly or indirectly from the possession or control of the financial institution to the defendant.  *See generally United States v. Van Alstyne*, 584 F.3d 803, 819 (9th Cir. 2009) ("Under this language, the only effect on a financial institution that counts is money flowing from a financial institution into the defendant's coffers.").  It clearly did so here:  HSBC-Monaco transferred $2 million from Soundview Elite's HSBC-Monaco bank account to Leveraged Hawk's Citibank account—as a result of Muho's trickery.

Which brings us logically to the second prong:  Because the enhancement applies only if the defendant's derivation of gross receipts from a financial institution is "as a result of the offense," the financial institution must be—as HSBC-Monaco was—victimized by the offense conduct.  This element is easily met when the financial institution's own property has been "derived" by a thief or fraudster, such as in larceny or in an "inside" job, like embezzlement, loan fraud,

---

6. There may be a reason to define "source" differently in the investment realm as opposed to banking, but *Stinson* did not address banking and banks—and we do not address investment houses—as financial institutions.

or theft of bank property by an employee.  And it is equally true here: Muho used fraudulent documents to convince the bank that he had control over the account of another, thereby inducing the bank to wire the funds of another to Muho's account without even looking at the third base coach to see if it should swing or not.  The bank swung away and made contact.  Muho caught the funds and made out of the stadium gates like a bat out of Boston.[7]

This play separates the facts of our case from those in *United States v. Huggins*, 844 F.3d 118 (2d Cir. 2016), a case in which *investors* were duped by a fraudster to deposit funds *into the fraudster's account* from which the fraudster, predictably and legally, withdrew them.  The Second Circuit recognized that, though the funds were withdrawn from the bank, the defendant derived property from the investors, not the bank.  In a fit of unintended understatement, the Court wrote that "[a]pplying the enhancement to all cases where a defendant merely withdraws money from his own bank account at a financial institution cuts too broadly . . . ."  *Id*. at 120–21.  Our holding today is consistent with *Huggins*.  The financial institution must be a target of the offense conduct.

The Guideline's history supports such a reading.  Prior to its amendment, this Guideline enhancement called for a four-level enhancement "[i]f the offense . . . *affected* a financial institution and the defendant derived more than

---

7.  We do not intend to implicate the Red Sox in this fraud.

21

$1,000,000 in gross receipts from the offense."  U.S.S.G. § 2B1.1(b)(6)(B) (2000

ed.) (emphasis added).  As the Ninth Circuit pointed out, "under this [previous]

language any impact on a financial institution would do."  *Van Alstyne*, 584 F.3d at

819.  In contrast, the modern Guideline "makes equally clear that the enhancement

only applies if gross receipts in excess of $1 million are derived *from* a financial

institution."  *Id.* (emphasis added).  The new Guideline is thus narrower than its

predecessor.  As the Third Circuit recognized, "mere tangential effects on financial

institutions will not support application of the enhancement."  *Stinson*, 734 F.3d at

186.  "Deriving" gross receipts from a financial institution demands more than

being "affected."  While a financial institution may be "affected" if it faces

heightened exposure to risk or serves as a conduit for transfers of property,

property is only "derived" from a financial institution if sufficient indicia of source

and victimization are present.[8]

---

8. District courts are instructed to apply this narrower two-level enhancement *or* to apply a four-level enhancement "[i]f . . . the offense (i) substantially jeopardized the safety and soundness of a financial institution; or (ii) substantially endangered the solvency or financial security of an organization that, at any time during the offense, (I) was a publicly traded company; or (II) had 1,000 or more employees," whichever is *greater*.  U.S.S.G. § 2B1.1(b)(16)(B) (2016 ed.); U.S.S.G. § 2B1.1(b)(17)(B) (2018 ed.).  One rationale for the enhancement, illustrated by its bifurcation into two- and four-level applications, is that deriving more than $1 million from a financial institution has greater potential spillover effects than deriving more than $1 million from Mr. or Ms. Private Citizen.  Taking that much money from a financial institution impacts the financial system because, *e.g.*, it could trigger an FDIC audit or payout, it could endanger the deposits or investments of many innocent people, and it could prompt layoffs or stock selloffs.  In a small enough financial institution or a big enough heist, such conduct could jeopardize the institution's solvency, shake public or community confidence in the financial system, and deter individuals from depositing or investing their money.

These factors—source and victimization—are cousins. They both overlap and operate independently to define the scope of the enhancement's application. The source prong requires an intentional, close examination and finding of from whence the property is derived, and our definition clarifies that a defendant may "derive" property of which the financial institution is not the sole owner. The victimization prong acts to cabin the meaning of "source." It ensures that the enhancement does not apply when the defendant derived property that he or she had some lawful right of ownership, possession, or control over, as in *Huggins*. In other words, the offender cannot be the owner of the property, nor have a right to control the property for the enhancement to apply. When it is the offender's own funds that are being held by the bank, he cannot victimize the bank because he can do whatever he wants with his own money.

Nor does the enhancement apply when the bank holds the property, but is not the victim of the heist. An example would be if, as stated above, Muho convinced Soundview Elite to direct HSBC-Monaco to wire Soundview funds from its account into Muho's account. Or a nefarious nephew might unduly influence a rich aunt to go into her safe deposit box and give him cash and jewels in excess of $1 million. In both examples, the enhancement would not apply, but the property was held by a bank which was not the victim.

23

Furthermore, our holding does not implicate pass-through banking conduct, like ordinary checking transactions and wire transfers.[9]  An ordinary wire transfer is simply an electronic check, an instant transfer of funds rather than a multistep transfer of a piece of physical paper representing funds the bank holds for a depositor.  An ordinary check takes days to clear in customary banking practices; a wire transfer "clears" almost instantly.  But it is the same transaction:  Funds pass *from* one bank to another, not *through* a bank.  The sending bank possesses the funds initially; the recipient bank possesses them ultimately.  In no way would the guideline apply to either ordinary wire transfers or checking transactions, not because of the source requirement, but because of the victimization requirement.

In many cases involving banks, the victimization prong may end up doing most of the work.  Muho snookered the system; he tricked the bank with forged documents, inducing the bank to initiate the wire transfer.  As it happened, the

---

9. A wire transfer is a "transfer of funds done electronically across a network of banks . . . around the world."  Julia Kagan, What Is a Wire Transfer?, *Investopedia* (May 29, 2020), https://www.investopedia.com/terms/w/wiretransfer.asp (last visited Oct. 22, 2020).  "No physical money is transferred between banks or financial institutions when conducting a wire transfer [nor does a check transfer physical money]."  *Id.* (brackets added).  "Instead, information is passed between banking institutions about the recipient, the bank receiving account number, and the amount transferred."  *Id.*  "The sending bank sends a message to the recipient's bank with payment instructions through a secure system . . . .  The recipient's bank receives all the necessary information from the initiating bank and deposits its own reserve funds into the correct account."  *Id.*  "The two banking institutions then settle the payment on the back end (after the money has already been deposited) [same as a check]."  *Id.* (brackets added).

bank was both the source of the funds and the victim of the offense, and the guideline enhancement was triggered.

To sum up, the Guideline was correctly applied. First, HSBC-Monaco, not Muho, was a source of the derived property. Second, control over the property transferred directly from HSBC-Monaco to Muho. Third, the bank was not just a conduit for a transfer of property that resulted from criminal conduct directed elsewhere; rather, the bank was a victim of Muho's fraud. For purposes of this sentencing enhancement, we hold that Muho derived the property from HSBC-Monaco. The sentencing court did not err in applying the two-level enhancement.

## D. Substantive Reasonableness of Sentence

Finally, Muho argues that his sentence was substantively unreasonable. We review a claim that a sentence is substantively unreasonable under "a deferential abuse of discretion standard." *United States v. Early*, 686 F.3d 1219, 1221 (11th Cir. 2012).

In considering the reasonableness of a sentence, the Eleventh Circuit looks to the 18 U.S.C. § 3553(a) factors, "tak[ing] into account the totality of the circumstances." *Gall v. United States*, 552 U.S. 38, 51 (2007). A district court "abuses its considerable discretion" only when it "(1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in

considering the proper factors." *United States v. Rosales-Bruno*, 789 F.3d 1249, 1256 (11th Cir. 2015) (quoting *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc)). In this context, Muho must show that his sentence "lies outside the range of reasonable sentences dictated by the facts of the case." *Irey*, 612 F.3d at 1190 (internal quotation marks and citation omitted). Perhaps unsurprisingly, sentences are rarely overturned. *See, e.g.*, *id.* at 1191.

Muho's sentence was not substantively unreasonable. Though the Guidelines are not themselves dispositive, sentences that fall within the Guidelines range or that are below the statutory maximum are generally reasonable. *See, e.g.*, *United States v. Hunt*, 941 F.3d 1259, 1264 (11th Cir. 2019) ("We have said that if the sentence imposed is below the statutory maximum . . . that is a factor indicating that the sentence is reasonable."). Muho received a small *downward* variance and his sentence was far below the applicable statutory maximum. Moreover, Muho concedes that the district court considered the relevant factors and "determined that a slight variance was warranted."

Accordingly, having reviewed the substantive reasonableness of Muho's sentence, we find that the district court did not abuse its discretion.

## III.

Muho's conviction and sentence are AFFIRMED.