RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0071p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

       Plaintiff-Appellee,

   *v.*

TYLER N. ROSS,

      *Defendant-Appellant.*

No. 24-1856

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:23-cr-20451-1—Jonathan J.C. Grey, District Judge.

Decided and Filed: March 31, 2025

Before: MOORE, GIBBONS, and MURPHY, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ON BRIEF:** Mark J. Kriger, LARENE & KRIGER, P.L.C., Detroit, Michigan, Douglas A. Berman, Dublin, Ohio, for Appellant. Mahogane D. Reed, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

───────────────

## OPINION

───────────────

KAREN NELSON MOORE, Circuit Judge. Defendant-appellant Tyler Ross pleaded guilty to one count of conspiracy to commit an offense against the United States based on his involvement in a scheme to provide mortgage lenders with inflated income information about properties owned by his real-estate-investment firm. Ross argues that the district court erred when it applied a sentencing enhancement for defendants who "derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the[ir] offense." U.S. Sent'g

Guidelines Manual § 2B1.1(b)(17)(A) (U.S. Sent. Comm'n 2023).  Because the government showed by a preponderance of the evidence that Ross's conduct met the enhancement's requirements, and because Ross's contrary interpretations of the enhancement are inconsistent with the Sentencing Guideline's text, we **AFFIRM** the district court's judgment.

## I.  BACKGROUND

Ross waived his right to an indictment and pleaded guilty to an information that charged him with one count of conspiracy to commit an offense against the United States under 18 U.S.C. § 371 for his participation in a scheme to violate 18 U.S.C. § 1014, which makes it a crime to make a false statement to a mortgage lending business for the purpose of influencing the action of that business in connection with a loan.  R. 12 (Plea at 1–3) (Page ID #23–25).  At all relevant times, Ross served as a manager and co-CEO of ROCO Real Estate LLC and ROCO Management LLC (collectively, "ROCO").  *Id.* at 4 (Page ID #26).  "ROCO operated as a commercial real estate investment firm engaged in the business of purchasing, managing, and selling multi-family residential properties, such as apartment complexes, . . . for itself and its private investors who invested in specific ROCO Properties."  *Id.* at 4–5 (Page ID #26–27).  Ross admitted that, in the course of operating ROCO, he "and his co-conspirators agreed to, and did, submit, and cause to be submitted, false financial documents to mortgage lending businesses for underperforming ROCO Properties, making the properties appear to be more profitable than they were."  *Id.* at 5 (Page ID #27).  The purpose of this scheme was to "[m]ake it appear in financial documents submitted as part of ongoing reporting requirements for existing mortgages that underperforming ROCO Properties were performing better" than they actually were, as well as to "obtain favorable mortgage valuations in accordance with lenders' underwriting requirements . . . in connection with . . . refinancing applications."  *Id.*

The falsified financial documents chiefly took the form of trailing twelve-month operating statements ("T12s") that "tracked the financial performance, including various categories of income and expenses, of a property over the preceding twelve months and aggregated the property's performance and profitability."  *Id.* at 6 (Page ID #28).  Mortgage-lending businesses use T12s to calculate a property's net operating income ("NOI") as well as its debt service coverage ratio ("DSCR")—"a ratio of a property's [NOI] to its total debt service

obligations." *Id.* at 5–6 (Page ID #27–28). These values allow lenders to "determine the value of the property for refinancing . . . and to assess [a borrower]'s continuing ability to meet its obligations during the loan period." *Id.* at 6 (Page ID #28). For existing loans, a reduction in a property's profitability can have consequences for the borrower and for the terms of the relevant loan: "[i]f a . . . property fail[s] to meet or maintain a certain DSCR ratio after closing, certain mortgage lending businesses c[an] exercise contractual provisions to protect themselves, including, but not limited to, requiring [the borrower] to maintain rental payments in escrow for oversight and safekeeping or restricting future loan opportunities for [the borrower]." *Id.*

Ross admitted that, "[t]o falsely overstate the NOI for . . . underperforming properties," he and his coconspirators "extracted the true and accurate T12s from ROCO's internal accounting system," "deleted or reduced actual expenses incurred," and "inflated income for certain itemized funding streams." *Id.* at 7 (Page ID #29). He and his coconspirators had on multiple occasions submitted such false information to a mortgage lending business "for the purpose of influencing the action of that business in connection with a loan." *Id.* at 2, 7–9 (Page ID #24, 29–31).

The plea agreement specified that "[t]he parties . . . disagree[d] as to whether the enhancement under [United States Sentencing Guidelines] § 2B1.1(b)(17)(A) and . . . (D) appl[ied] in determining" Ross's guideline range and reserved their rights to make arguments as to its application. *Id.* at 15 (Page ID #37). That dispute is the center of this appeal.

The applicable Guideline provides that "[i]f . . . the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense," the defendant's offense level should be increased by two levels. USSG § 2B1.1(b)(17)(A). Where the Guideline applies, it also requires a base offense level of 24. *Id.* § 2B1.1(b)(17)(D). Commentary to the Guideline states that "'[g]ross receipts from the offense' includes all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense." *Id.* § 2B1.1 cmt. n.13(B).

In advance of sentencing, the government argued that the gross-receipts enhancement should apply based on a 2019 incident wherein ROCO sold 43 properties to a New York based

investment company called the Chetrit Group and, in the course of negotiating the deal, provided the Chetrit Group with falsified T12s.  R. 42 (PSR ¶ 13).**1**  The Chetrit Group subsequently submitted those T12s to JPMorgan Chase Bank ("JPMorgan") in support of its application for a loan to finance the deal.  R. 32 (Evid. Hr'g Tr. at 82, 121–25) (Page ID #921, 960–64).  The properties were sold for just shy of $520 million, $481 million of which was financed by a loan from JPMorgan.  *Id.* at 24–25 (Page ID #863–64).  Ross received just over $2 million from the sale.  *Id.*

The district court held an evidentiary hearing and found that the gross-receipts enhancement applied.  R. 39 (Order) (Page ID #1031).  The district court pointed to evidence in the record that Ross was aware that most similar real-estate transactions required financing from a financial institution, as well as evidence that, by the time the 2019 transaction closed, Ross knew JPMorgan was providing the financing and would review historical financial information for the subject properties.  *Id.* at 6–7 (Page ID #1036–37).  The record, the district court noted, also reflected that (unknowingly) the Chetrit Group provided JPMorgan with the falsified T12s it received from ROCO and that JPMorgan reasonably relied on them.  *Id.* at 7–8 (Page ID #1037–38).  The district court's application of the gross-receipts enhancement increased Ross's base offense level from 6 to 24.  R. 42 (PSR ¶ 33).**2**  Given Ross's criminal history category of I, the PSR and the district court accordingly calculated Ross's guideline range at 46–57 months of imprisonment, *id.* ¶ 67; R. 51 (Sent'g Tr. at 6) (Page ID #1191), and the government recommended a below-guidelines sentence of 36 months of imprisonment, R. 43 (Sent'g Mem. at 3) (Page ID #1096).  The district court ultimately granted a downward variance and sentenced Ross to a term of imprisonment of 12 months and one day.  R. 47 (Am. J. at 2) (Page ID #1176).

---

**1**The district court found that the 2019 transaction was relevant conduct for sentencing purposes because Ross's provision of falsified T12s to the Chetrit Group "was the same as Ross undertook with respect to the ROCOs [sic] financials (including T12s and the NOI therein) that constituted the basis for the underlying charge and conviction in this case."  R. 39 (Order at 5) (Page ID #1035).  Ross does not challenge this finding on appeal. Appellant Br. at 8.

**2**Ross received a two-level enhancement for his role as an organizer or leader of the scheme, as well as a three-level reduction for acceptance of responsibility, resulting in a total offense level of 23.  R. 42 (PSR ¶¶ 35, 39–41).

On appeal, Ross argues that the district court erred by applying the gross-receipts enhancement.  Relying on the enhancement's text, purpose, and structure, Ross asserts that the enhancement is inapplicable to him because he derived receipts from a real-estate firm (the Chetrit Group) rather than a financial institution, because his offense did not target a financial institution, and because he neither caused nor intended loss.  Appellant Br. at 5, 9, 11, 21.

## II.  ANALYSIS

### A.  Standard of Review

Ordinarily, "[i]n evaluating the district court's calculation of the advisory Guidelines range, we review the district court's factual findings for clear error and its legal conclusion *de novo*."  *United States v. Lalonde*, 509 F.3d 750, 763 (6th Cir. 2007).  In this circuit, "the standard for reviewing a Guidelines enhancement applied to a given fact pattern is somewhat murky" because it involves "mixed questions of law and fact."  *United States v. Abdalla*, 972 F.3d 838, 850 (6th Cir. 2020).  We have, however, held that "'the district court's application of the guidelines to the facts' should receive 'due deference.'"  *Id.* (quoting *United States v. Ummin*, 820 F. App'x 353, 356 (6th Cir. 2020)).  Before the district court, "[t]he burden of proof lies with the government to show, by a preponderance of the evidence, that a sentencing enhancement applies."  *United States v. Golson*, 95 F.4th 456, 462–63 (6th Cir. 2024).  Here, the government carried its burden and the district court correctly applied the gross-receipts enhancement, so Ross's arguments fail under any standard of review.

### B.  The Gross-Receipts Enhancement

This court has not yet had the occasion to interpret United States Sentencing Guidelines ("USSG") § 2B1.1(b)(17), but our sibling circuits have occasionally analyzed the provision.  In *United States v. Huggins*, 844 F.3d 118 (2d Cir. 2016), the Second Circuit considered the enhancement as applied to a defendant who ran a series of sham companies and induced victims to wire him purported investments, which he ultimately withdrew from the bank and used for personal purposes.  *Id.* at 120–21.  The court interpreted the enhancement's text—requiring that gross receipts be "derived . . . from one or more financial institutions as a result of the offense,"

USSG § 2B1.1(b)(17)(A)—to apply only where the financial institution "suffers a loss or incurs liability." *Id.* at 123.

The Second Circuit held that it was error to apply the gross-receipts enhancement to Huggins's case because the bank from which he had withdrawn his ill-begotten gains did not "suffer a loss or liability" as a result of his fraud. *Id.* Instead, it was the would-be investors who suffered loss or liability as a result of Huggins's actions. The court reasoned that "when a defendant simply withdraws money he deposited in a bank, the financial institution is not incurring any meaningful new liability nor is the criminal leveraging the financial institution's balance sheet to support criminal activity." *Id.* To hold otherwise would, the court held, be inconsistent with the primary purpose of the enhancement, which was "to penalize an individual for placing a financial institution at risk by borrowing or stealing funds to support criminal activity." *Id.* at 123–24.

In *United States v. Muho*, 978 F.3d 1212 (11th Cir. 2020), the Eleventh Circuit faced a different set of facts. The defendant had falsely represented to a bank that he had legal authority to execute transactions on behalf of a former employer and induced the bank to wire money from the employer's account to the account of a shell company that the defendant controlled. *Id.* at 1216. The court held that "at least in a case involving property held by a financial institution for a depositor, the financial institution (1) must be the *source* of the property, which we interpret as having property rights in the property, and (2) must have been *victimized* by the offense conduct." *Id.* at 1221.

The Eleventh Circuit rooted its "source" requirement in the enhancement's provision that receipts be "derived . . . from" a financial institution. *Id.* at 1221–22. The court reviewed the plain meaning of the word "derive," and held that it "call[ed] for identification of the *specific* source of the property." *Id.* at 1222; *accord United States v. Stinson*, 734 F.3d 180, 186 (3d Cir. 2013). Accordingly the court held that to trigger the enhancement, "the financial institution, before the offense conduct, [must have] possesse[d] and control[led] the property to be filched."

*Muho*, 978 F.3d at 1222.**³**  And, the court held, "to establish the financial institution as the source of the derived funds, the sentencing court must find that the relevant property flowed directly or indirectly from the possession or control of the financial institution to the defendant."  *Id.* at 1224.

Turning to the "victimization" prong of its analysis, the Eleventh Circuit noted that the most obvious case in which a financial institution is "victimized" is when it is deprived of its own property as a result of an offense.  *Id.*  "The victimization prong . . . ensures that the enhancement does not apply when the defendant derived property that he or she had some lawful right of ownership, possession, or control over . . . .  When it is the offender's own funds that are being held by the bank, he cannot victimize the bank because he can do whatever he wants with his own money."  *Id.* at 1225.  The *Muho* court distinguished *Huggins*, pointing out that there, "*investors* were duped by a fraudster to deposit funds *into the fraudster's account* from which the fraudster, predictably and legally, withdrew them."  *Id.* at 1224.  The bank did possess or control the money in Huggins's account and it did flow from the bank's possession to his.  But, although Huggins's fraud caused would-be investors to wire him money, it was his lawful withdrawal of those funds (and not his offense) that resulted in him "deriving" or receiving those funds from the bank.  By contrast, "Muho used fraudulent documents to convince the bank that he had control over the account of another, thereby inducing the bank to wire the funds of another to Muho's account."  *Id.*  Muho's fraud caused the bank to release funds to him.

Ross's case is more like Muho's than it is like Huggins's.  At the evidentiary hearing, the government presented evidence that ROCO provided the Chetrit Group with falsified T12s, which the Chetrit Group then provided to JPMorgan.  R. 32 (Evid. Hr'g Tr. at 36–37, 58) (Page ID #875–76, 897).  This was to be expected by all parties because ROCO, as the seller, naturally would have had possession of the relevant historical financial data reflected in the T12s.  *See id.* at 125 (Page ID #964).

---

**³**But, the *Muho* court was quick to caution, "the financial institution as a 'source' need not have full ownership of the property."  *Muho*, 978 F.3d at 1223.  This, the court wrote, "recognize[d] the routine practices of many financial institutions, like banks, which exercise varying degrees of dominion or control over property that is technically owned by others."  *Id.*  According to the court, the Sentencing Commission could have drafted the enhancement to require otherwise had it desired.  *Id*.

A witness who partnered with the Chetrit Group on the 2019 transaction testified that it was customary "to use bank financing for real estate acquisitions," particularly in a deal as large as the 2019 transaction. *Id.* at 81 (Page ID #920). So, too, was it common for a buyer to provide its lender with historical financial data (in the form of T12s) obtained from the seller. *Id.* at 83 (Page ID #922). In fact, of the hundreds of multifamily-real-estate deals the witness had worked on, all had used T12s for valuation purposes, and in all, T12s were provided to the lender. *Id.* at 102 (Page ID #941).

The JPMorgan banker in charge of the financing for the 2019 transaction testified that "[t]he T12 is a critical component of how [JPMorgan] determine[s] leverage, interest rate, and credit" for a loan. *Id.* at 123 (Page ID #962). T12s and the NOIs reflected therein help banks assess the value of the subject real estate and determine how much debt or leverage a property's income flow can withstand. *Id.* at 122 (Page ID #961). There was also evidence that JPMorgan conducted an appraisal of ROCO properties and relied on the falsified T12s when determining those properties' value. *Id.* at 70–74, 126–27 (Page ID #909–13, 965–66). The banker testified that JPMorgan in fact used the NOI information contained in the falsified T12s to determine how much to lend the Chetrit Group and at what interest rate. *Id.* at 128, 133–34 (Page ID #967, 972–73).

JPMorgan also used the loan it issued to the Chetrit Group to create something known as commercial mortgage-backed securities by holding the loan in trust and selling bonds on that loan to investors. *Id.* at 120 (Page ID #959). In doing so, the banker testified, JPMorgan relied on the falsified T12 information to prepare the historical operating data it presented to potential investors. *Id.* at 129–30 (Page ID #968–69). This data was important as a matter of underwriting and, because JPMorgan was distributing bonds to the public, the accuracy of the NOI information implicated JPMorgan's "obligations as a broker-dealer and [its] reputation." *Id.* at 123–24 (Page ID #962–63). If JPMorgan had known about the falsified T12s, it would have "stopped the deal in its tracks." *Id.* at 132, 134 (Page ID #971, 973).

### 1.  Source

In the face of this evidence, we cannot countenance Ross's assertions that the 2019 Chetrit-Group deal was a "sales transaction between two private entities that are not financial institutions," Appellant Br. at 22, and that Ross therefore "derived receipts from a real-estate firm, not from a financial institution," *id.* at 9.  Of course, Ross's $2 million in gross receipts were paid by the Chetrit Group to ROCO and then Ross *out of the money JPMorgan lent the Chetrit Group to complete the sale.*  R. 32 (Evid. Hr'g Tr. at 24–25) (Page ID #863–64).[4]  But, under Ross's construction, the enhancement would apply only where a defendant, as a result of their offense, obtained gross receipts *directly* from a financial institution.  For several reasons, this cannot be.

First and foremost, as evidenced by the Sentencing Commission's ("the Commission") definition of "[g]ross receipts from the offense," it contemplated that qualifying gross receipts might be "obtained directly or indirectly as a result of [the] offense."  USSG § 2B1.1 cmt. 13(B).  This makes sense because

> Section 2B1.1 of the Guidelines applies to a broad range of criminal conduct including larceny, embezzlement, and other forms of theft; offenses involving stolen property and property damage or destruction; fraud and deceit; forgery; and offenses involving altered or counterfeit instruments. In turn, these broad categories encompass bank fraud, college scholarship fraud, Ponzi schemes, health care fraud, and a host of other wrongs.  Even when limited to property taken from financial institutions, the range of entities is vast.

*Muho*, 978 F.3d at 1221 (footnotes omitted).  The Commission, undoubtedly aware of the complex financial-services market, retained a broad definition of "gross receipts from the offense," signaling that it would not have intended to limit the enhancement's application to only gross receipts transferred *directly* from a financial institution to a defendant.[5]

---

[4]There is no allegation that JPMorgan did not possess or control the money it lent to the Chetrit Group.  *See Muho*, 978 F.3d at 1222.

[5]A 2001 update to the text of the Guidelines itself replaced a requirement that the defendant derive $1,000,000 in "gross receipts from the offense" with the requirement that the gross receipts be derived from the financial institution, rather than the offense as a whole.  *See United States v. Hartz*, 296 F.3d 595, 599 (7th Cir. 2002).  Despite the change to the Guideline's text, the Commission retained the definition of "gross receipts from the offense" found in Comment 13(B).  *See* USSG § 2B1.1 cmt. 13(B); *United States v. Earquhart*, 795 F. App'x

Ross's underdeveloped assertion that this definition is relevant only to "dispute[s] as to the amount of qualifying 'gross receipts,'" Appellant Br. at 14 n.4, is totally without supporting authority or logical underpinning. If money received indirectly from a financial institution can be counted in the *amount* of qualifying gross receipts (as Ross seems to imply), such money must necessarily qualify as gross receipts derived from a financial institution, so long as it was derived as a result of the defendant's offense. *See Muho*, 978 F.3d at 1224 ("[T]o establish the financial institution as the source of the derived funds, the sentencing court must find that the relevant property flowed directly or indirectly from the possession or control of the financial institution to the defendant.").

Ross's reliance on *United States v. Earquhart*, 795 F. App'x 885 (4th Cir. 2019) (per curiam), cannot save him. In *Earquhart*, the defendant purchased a number of foreclosed homes, falsified documents to "mak[e] it appear as though the properties were free and clear of encumbrances[,] . . . [and] sold the properties to unaware third-party purchasers, pocketing sales proceeds." *Id.* at 886. The Fourth Circuit held it was error to apply the gross-receipts enhancement because "the proceeds from the home sales came not from the [financial-institution] lienholders, but from *third-party purchasers*—four individual purchasers and four entities." *Id.* at 887. Ross makes much of this language, but *Earquhart* is more analogous to *Huggins* than it is to *Muho* or to this case. Earquhart's proceeds were derived from his fraud on the home purchasers, rather than from his fraud on the financial-institution lienholders. Although Earquhart's fraud deprived the financial institutions of their liens, the source of his receipts was the home sales. Had the court considered evidence that Earquhart's gross receipts were derived from the *purchasers' lenders* (as is the allegation here), the analysis might have been different. *See id.* at 887 n.1 ("We note that even assuming that all four [purchasing] entities were financial institutions for purposes of the Enhancement (the Government does not so

---

885, 888 (4th Cir. 2019) (per curiam). Whatever weight the comment now carries, it reinforces the fact that, as explained in *Muho* and elsewhere, the plain meaning of the word "derive" as it is used in the text of the Guideline itself "calls for identification of the *specific* source of the property," 978 F.3d at 1222, and does not refer to the proximity between the source and recipient, *see Derivation*, Black's Law Dictionary (12th ed. 2024) ("The origin of something, esp[ecially] a word, phrase, or idea."). The updated Guideline remains applicable to Ross, who derived over $1,000,000 in gross receipts from a financial institution, not just from his offense as a whole. R. 32 (Evid. Hr'g Tr. at 24–25) (Page ID #863–64).

contend), Earquhart's total gross receipts [from the purchasing entities] would not exceed $1,000,000, as required by the guideline.").

Nor are we persuaded by Ross's insistence that he "did not target JP Morgan Chase . . . because JP Morgan Chase was not involved in the transaction at the time Mr. Ross first provided T12s to the Chetrit Group." Appellant Br. at 10. As the testimony showed, the very nature of the commercial-real-estate market implicates the involvement of financial institutions as lenders. R. 32 (Evid. Hr'g Tr. at 81, 102) (Page ID #920, 941). The idea that Ross would have believed that the Chetrit Group might pay for a $500-million transaction in cash, without assistance from a lender, strains credulity; it ignores the realities of the commercial-real-estate market (as proven by record evidence), as well as the overall context of Ross's crime.

Ross is insistent that his provision of falsified T12s to the Chetrit Group "was not directly connected to [his] offense conduct involving documents provided to mortgage lenders," Appellant Br. at 6, but Ross pleaded guilty to an overarching conspiracy to make ROCO properties appear more valuable than they were in order to obtain or preserve favorable mortgage and refinancing terms. R. 12 (Plea at 4–9) (Page ID #26–31). Financial institutions were integral to Ross's business and to his scheme, just as they are integral to the commercial-real-estate market as a whole. R. 32 (Evid. Hr'g Tr. at 81, 102) (Page ID #920, 941). Ross repeatedly "leverage[ed] the financial institution's balance sheet[s] to support criminal activity." *Huggins*, 844 F.3d at 123. In *Muho*'s parlance, Ross's offense targeted lending institutions, including JPMorgan, and JPMorgan was the source, albeit the indirect source, of his gross receipts. *See Muho*, 978 F.3d at 1224.

### 2. Victimization

So, too, was JPMorgan victimized. *See id.* at 1224–26. Ross's conduct falls squarely within the theory behind the enhancement's creation that, "[b]y stealing or fraudulently borrowing from a financial institution, the criminal is putting that institution's financial safety and soundness at risk." *Huggins*, 844 F.3d at 123. The loan that JPMorgan ultimately underwrote for the Chetrit Group was riskier than it appeared to be; the ROCO properties earned less income than advertised, meaning that the Chetrit Group had less income at its disposal to

pay its debts to JPMorgan. Indeed, the Chetrit Group and its property-management company ultimately concluded that properties purchased from ROCO had "less revenue and higher costs than expected." R. 32 (Evid. Hr'g Tr. at 100) (Page ID #939). Had JPMorgan known the properties' true NOI, it might have charged higher interest. By overstating the NOI, Ross effectively deprived JPMorgan of the benefit of its bargain and devalued its security interest in the properties. Far from the situation in *Huggins*, where the financial institution was a mere conduit for fraudulently obtained funds, here mortgage lenders, including JPMorgan, were a target of Ross's actions and were victimized as a result of his offense. *See Muho*, 978 F.3d at 1224.

Indeed, although the government was clear that it was not seeking to prove a loss for purposes of the guidelines, it correctly noted that loss "is not a perfect measure of culpability." R. 51 (Sent'g Tr. at 22) (Page ID #1207). "When the defendant overstated the financial performance of ROCO's properties, he subjected lenders and others to considerable financial risk they were not aware of, risks that they could . . . have taken steps to mitigate. They could have lent less money. They could have charged higher interest rates that corresponded with the risk they were taking." *Id.* Even in the absence of loss, the government argued, "when Mr. Ross placed others at risk, those credit risks, they matter. . . . We saw what happened in the great recession . . . [when financial institutions] got that credit risk analysis wrong. And they had to be bailed out with billions and billions of taxpayer dollars. So this matters. But that's not captured in the loss." *Id.* at 23–24 (Page ID #1208–09); *see Huggins*, 844 F.3d at 123–24 (describing the gross-receipts enhancement's primary purpose as "to penalize an individual for placing a financial institution at risk by borrowing or stealing funds to support criminal activity"). It was the government's position that "[t]he defendant in this case got lucky. He did not cause a guidelines loss. This wasn't an economic recession. The timing was good." R. 51 (Sent'g Tr. at 21) (Page ID #1206). But, the government argued that Ross's view that his lies produced "[n]o harm, no foul" "caused this defendant to engage in this crime." *Id.* at 20 (Page ID #1205). The government cautioned that anything short of a custodial sentence would send the message to others "that this sort of criminal conduct is a risk worth taking, you may never get caught, because these are crimes that are difficult to detect [and] . . . [u]sually . . . are only detected when something terrible has happened." *Id.* at 32 (Page ID #1217).

For several reasons, including those stated by the government, Ross's argument that the structure and history of the enhancement demonstrate that it was "meant only to apply in major fraud cases involving millions in losses to financial institutions" is unavailing. Appellant Br. at 20. The text of today's enhancement originates from the year-2001 Amendment 617 to the Sentencing Guidelines. USSG App. C, Vol. II at 127, Am. 617. That Amendment made significant structural changes to the Guidelines for theft and fraud. First and foremost, Amendment 617 consolidated what were previously distinct Guidelines for theft, property destruction, and fraud, respectively. *See id.* at 172.

The Amendment also revised the loss table now contained in § 2B1.1(b)(1), which provides for incremental increases in offense level based on the magnitude of fiscal loss caused by the offense. *See id.* at 175. The revised table "expand[ed] the previously existing one-level increments into two-level increments, thus increasing the range of losses that correspond to an individual increment." *Id.* This was done in response to comments from stakeholders that the previous version "under-punish[ed] individuals involved with moderate and high loss amounts, relative to penalty levels for offenses of similar seriousness sentenced under other guidelines." *Id.* at 175–76.

Finally, as relevant here, the Amendment modified the gross-receipts enhancement from a four-level enhancement to today's two-level enhancement, but retained the minimum offense level of 24. *Id.* at 175. The Commission explained that this reduction was a result "of the increased offense levels that will result from the loss table for the consolidated guideline." *Id.* In other words, retention of the four-level enhancement, when coupled with increased offense levels instituted by the new loss table, would risk overpunishing certain offenders. But the Commission did not eliminate the enhancement entirely, stating that to do so "would not provide an appropriate punishment for those offenders involved with losses that are in the $1,000,000 to $2,500,000 range of loss." *Id.* Ross quotes this language and argues that "the Commission here explains that it expects that it will be only if, and only when, a defendant fraudulently derives over $1,000,000 from a financial institution that the defendant should get (only) a two-point enhancement in addition to a large 'loss' enhancement to reach 'an appropriate punishment.'" Appellant Br. at 18. But the Guideline itself affords absolutely no reason to suspect that the

Commission intended that the gross-receipts enhancement would always apply in tandem with § 2B1.1(b)(1)'s loss-table-based enhancements.[6] Notably, neither Amendment 617 nor any subsequent amendment revised the gross-receipts enhancement to condition it on a finding of actual or intended loss.

Ross's loss-based interpretation of the revised enhancement is atextual. True, under the Guideline as a whole, the amount of loss caused by an offense is one major characteristic that may enhance a defendant's offense level. *See, e.g.*, USSG § 2B1.1(b)(1), (b)(7). But this demonstrates only that, if the Commission had wanted to make the gross-receipts enhancement contingent on loss, it knew exactly how to do so. Instead, as Congress dictated, the enhancement is focused on the benefit reaped by the defendant. Crime Control Act of 1990 § 2507, Pub. L. No. 101-647, 104 Stat. 4789, 4862 ("[T]he United States Sentencing Commission shall promulgate guidelines, or amend existing guidelines, to provide that a defendant convicted of violating, or conspiring to violate [certain criminal statutes] . . . affecting a financial institution . . . shall be assigned not less than offense level 24 under chapter 2 of the sentencing guidelines if the defendant derives more than $1,000,000 in gross receipts from the offense."). It makes perfect sense that Congress and the Commission would seek to punish adequately criminal conduct from which a defendant benefitted, even where no loss resulted, especially when, in the absence of loss, such crimes can be difficult to detect and deter. The text, structure, and history of the Guideline simply do not support Ross's assertion that the enhancement applies only when a defendant's crime caused loss. The district court did not err in applying the gross-receipts enhancement.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment.

---

[6]Significantly, Ross received the benefit of a significant downward variance —34 months from the bottom of his guideline range—in part, the district court explained, "given that there [was]n't actual loss." R. 51 (Sent'g Tr. at 40) (Page ID #1225).